42 A.3d 96

**Carlton Nicholas HENRY**

v.

**STATE of Maryland.**

**No. 952, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

April 25, 2012.

510

512

Katherine P. Rasin (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Diane E. Keller (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, KEHOE, IRMA S. RAKER (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

The primary question in this case is whether the State satisfied its burden to rebut the presumption, under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), that inculpatory statements given to the police by a suspect in custody after he had invoked his right to counsel were not voluntary. We hold that the State did not satisfy its burden of proof and the statements therefore should have been suppressed from evidence before trial.

In the Circuit Court for Prince George's County, Carlton Nicholas Henry, the appellant, was charged with two counts of first-degree rape; two counts of second-degree rape; kidnapping; attempted first-degree sexual offense; two counts of first-degree sexual offense; two counts of second-degree sexual offense; second-degree assault; and two counts of false imprisonment. Following a jury trial, he was acquitted of all charges except second-degree assault. The court sentenced him to ten years' imprisonment, with all but eight years suspended, with credit for time served, to be followed by three years' supervised probation. In his timely appeal, the appellant asks whether the circuit court erred in denying his motion to suppress inculpatory statements to the police and whether the court erred in denying his motion to dismiss based on an alleged speedy trial violation. As noted, we agree with the appellant that the court should have granted the suppression motion. Because we conclude that the court did not err in denying the speedy trial motion, we shall reverse the judgment and remand the case for further proceedings.

## FACTS AND PROCEEDINGS

For context, we shall review the State's evidence at trial. Casey Mark, the victim, testified that on February 5, 2009, she was working as a prostitute. At around 8:00 that evening, she met the appellant at a prearranged location in Virginia to have sex for money. Mark got into the appellant's vehicle and he began driving toward Maryland. At some point during the ride, the appellant pulled a butcher knife from the side of his

car door, held it against Mark's neck, and threatened to kill her. He then stopped the car and placed a blindfold over Mark's eyes. When the appellant resumed driving, he hit Mark's head with the flat part of the knife.

According to Mark, she and the appellant arrived at an apartment complex (in Maryland) and the appellant told her that if she ran he would shoot her. Thinking the appellant had a gun, Mark entered an apartment at the appellant's direction.[1] Inside, the appellant held the knife at Mark's throat, threatened her, and forced her down on the bed. Mark struggled to escape, at one point reaching for the knife, but she hit her head on a dresser and blacked out. When she came to, she was tied down to the bed. The appellant sexually assaulted her by forced vaginal intercourse, cunnilingus, fellatio, and attempted anal intercourse. The appellant used a condom during the forced vaginal intercourse. Afterward, he instructed Mark to take a shower, which she did. The appellant also took a shower.

After showering, Mark attempted to get dressed, but the appellant told her not to. He put on another condom and again forced vaginal intercourse and fellatio on her. Once again, he instructed Mark to shower afterward, which she did. The appellant then proceeded to clean the apartment. He directed Mark to put the blanket, sheets, and several towels in a bag.

Mark testified that the appellant forced her into his car, drove to a residential area, and ordered her to put the bag in a trash can. He then drove her to a nearby Metro station, told her he was a police officer, threatened to kill her if she told anyone anything about the encounter, and released her.

Mark contacted authorities at the Metro station, who called the police. When the police arrived, Mark directed them to the apartment and to the trash can where she had disposed of the evidence at the appellant's direction. The police searched

---

1. There was evidence that the apartment belonged to a friend of the appellant who was hospitalized at the time of the incident.

the apartment and also recovered the bag. The bag contained clothing, paper towels, sheets, a used condom, and a condom wrapper. DNA testing performed on the condom showed that the inside of the condom contained the appellant's DNA and the outside of the condom contained Mark's DNA.

## DISCUSSION

### I.

### *Motion to Suppress the Appellant's Statements to the Police*

#### A.

#### *Suppression Hearing Evidence and Ruling*

Before trial, the appellant filed a motion to suppress a written statement he gave the police; audiotaped statements he made to the police and a police photographer; and three photographs taken by the police photographer, all while he was in custody at the station house. At the suppression hearing, the State called three detectives with the Prince George's County Police Department: Sherry Prince, Denise Shapiro, and Meredith Bingley. The appellant testified on his own behalf. The evidence was as follows:

The police arrested the appellant on February 7, 2009, at about 12:30 a.m., after they had searched the apartment Mark had identified. The appellant was transported to the police station and placed in an interview room that was equipped with an automatic recording device. At the time, the recording device only was capturing audio, not video.[2]

Detective Prince met with the appellant at around 1:30 a.m., in the interview room, to obtain general information. The

---

2. Although witnesses at the suppression hearing referred to the audio recording as a "videotape," it is an audiotape. The actual audiotape was not admitted into evidence at the suppression hearing; however, it was played for the court at that time, several witnesses testified to its authenticity, and the suppression court relied upon it in reaching a decision on the motion. At trial, the audiotape was admitted as an exhibit.

audiotape reveals the following conversation between the appellant and Detective Prince, which made clear that, without a *Miranda* warning,[3] he knew he had a right to counsel and he invoked it:

> THE APPELLANT: Do I get a lawyer or something?
>
> DETECTIVE PRINCE: You're not under arrest.
>
> THE APPELLANT: So why am I here?
>
> DETECTIVE PRINCE: To talk about the incident that happened upstairs in apartment 303. The incident.
>
> THE APPELLANT: What incident?
>
> DETECTIVE PRINCE: The incident between you and another female.

The appellant proceeded to talk about something that happened between him and a woman "in Virginia." The conversation then continued:

> DETECTIVE PRINCE: Let me read you your rights.
>
> THE APPELLANT: So that's why I'm under arrest now?
>
> DETECTIVE PRINCE: You're not under arrest. I'm just reading you your rights.
>
> THE APPELLANT: Get me my lawyer then.

Detective Prince asked the appellant whether he had a lawyer; when he replied that he did not, Detective Prince left the room.

Not long thereafter, Detective Shapiro observed the light go off in the interview room in which the appellant was being detained. Explaining that this was a "safety issue," Detective Shapiro testified that she opened the door, turned the light on, and told the appellant that the light needed to remain on. The appellant asked to go to the bathroom, for a warm drink, and for some socks. Detective Shapiro told the appellant he was okay and left the room.

---

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Lieutenant Bingley, also on duty that night, was a sergeant assigned to the police department's sexual assault unit.[4] She testified that in the middle of the night in question, she was on duty and entered the interview room in which the appellant was detained, accompanied by a photographer. The audiotape reveals the following conversation:

THE APPELLANT: So when am I going to talk to a lawyer or something like that?

LIEUTENANT BINGLEY: One will be provided to you by the court.

THE APPELLANT: When is that?

LIEUTENANT BINGLEY: Probably um right around your preliminary hearing time. I'll explain everything to you. Okay?

THE APPELLANT: So am I being charged or something?

LIEUTENANT BINGLEY: Yep. You're being charged.

THE APPELLANT: What am I being charged with?

LIEUTENANT BINGLEY: Uh right now um I'm not sure yet so hold on a second.... I'll explain everything to you.

When asked at the suppression hearing if she had known whether the appellant could see a lawyer earlier than the preliminary hearing date, Lieutenant Bingley testified, "I don't know when he would be appointed a lawyer. I have no idea." She did not tell the appellant that. Also, when she told the appellant he would be charged, she did not know what the charges would be.

The police photographer who entered the interview room with Lieutenant Bingley took pictures of the appellant. The photographer asked him, "Where's your other injury?" The appellant showed the photographer another injury, which the

---

4. Unless quoting from the transcript, we will refer to Lieutenant Bingley by her assigned rank on the day of the motions hearing.

photographer took a picture of. The appellant told the photographer how he had been injured by a person with a knife.

The appellant again asked to be taken to the bathroom. Sergeant Robert Taylor entered the interview room and he and Lieutenant Bingley took the appellant to the bathroom. That required escorting the appellant out of the interview room (where the audiotape recorder was located) and down a hallway to where the bathroom was located. There was no recording device in the hallway or the bathroom. It is undisputed that when the appellant left the interview room to walk to the bathroom he had invoked his right to counsel more than once and had said nothing to the contrary, but by the time Sergeant Taylor and Lieutenant Bingley returned the appellant to the interview room, the appellant was saying that he wanted to talk.

The prosecutor questioned Lieutenant Bingley as follows about the trip to the bathroom:

[PROSECUTOR]: And when you walked with [the appellant] to the bathroom, do you remember whether or not there was any conversation between you and the defendant?

LIEUTENANT BINGLEY: On the way down, he kept asking whether he was being charged, what was he being charged with. And he went into the bathroom—

Q. Let me stop you for a minute. Did you go into the bathroom with him?

A. No, I did not.

Q. Okay. Did Sergeant Taylor go in with him?

A. I believe he did.

Q. And then what happened?

A. They came out. I stood by the bathroom door, just in case there was any problems, and then we walked back up the hallway and he—once he learned he was being charged, he started saying he wanted to make a statement now, he wanted to talk now.

Lieutenant Bingley further testified on direct that, with regard to the walk, the "whole way down and back from the

bathroom, [the appellant] was begging to give us that story, and we are so tired at this point, and we've had two other cases that night, we wanted him just to be quiet." The following important colloquy took place:

 Q. *So you're saying on the way down and back, you were not telling him any of your evidence against him at that point?*

 A. *I don't remember exactly what Sergeant Taylor said. He was leading the conversation.*

 Q. *So you're saying that you guys, meaning you and Detective Taylor, were not telling Mr. Henry the evidence that the police had and what he was being charged with.*

 A. *Like I said, I have no idea. I do not remember exactly what Sergeant—*

 Q. *You don't remember what Sergeant Taylor was telling him?*

 A. *Not exactly what Sergeant Taylor was telling him, no.*

(Emphasis added.)

Lieutenant Bingley agreed at the suppression hearing, upon hearing the audiotape of the three re-entering the interview room, that at that point Sergeant Taylor was saying, " 'it's better that you don't give us your statement because all the evidence points to'—he does kind of trail off. He says, 'points to,' trails off a little bit, 'is all ours.' " She further agreed that the audiotape reveals that, right after Sergeant Taylor said that, the appellant said, "but I want to tell you my side of the story."

The audiotape itself was played at the suppression hearing, as noted, and it reveals the following discussion between the appellant, Lieutenant Bingley, and Sergeant Taylor right after the appellant was returned to the interview room:

 THE APPELLANT: Yo, man. Can I talk to you? Can I explain my side of the story to you?

 LIEUTENANT BINGLEY: You asked for an attorney.

 THE APPELLANT: Right.

SERGEANT TAYLOR: Too late.

THE APPELLANT: Listen, my man,—

SERGEANT TAYLOR: Anything that you say right now we can't use so we don't need to hear it.

THE APPELLANT: Can I write it in pencil and paper?

SERGEANT TAYLOR: You can write it.

LIEUTENANT BINGLEY: Sure.... I'll have you sign the form for waiving. I can't guarantee you it's going to be used at all, but I will let you write down your side of the story. If you insist. We're saying, you asked for a lawyer, we heard you loud and clear ask for an attorney. But, we will let you write your side of the story.

According to Lieutenant Bingley, immediately after this exchange she obtained an advice of rights form, advised the appellant of his *Miranda* rights, and he waived his rights, signing the form at about 4:00 a.m. The appellant then wrote out a six-page statement, which was admitted into evidence at the suppression hearing. He also made an oral statement to Lieutenant Bingley.

The appellant's written statement begins: "I wanna write a statement, earlier I had asked for a lawyer but now I want to tell my story—what really happen." Lieutenant Bingley testified that she told the appellant to write that. The appellant's statement goes on to say that he had paid money to a woman known to him as "Tasha" in exchange for sex. He and the woman had met, not for the first time, on a Thursday night in Virginia. The woman directed him to a location to buy marijuana. When they arrived at the location, they exited the vehicle and were met by two men who started talking to the woman. The men asked what the appellant wanted and he told them he only wanted a "dub" and that "if I like it I will get more next time." When he walked back to his car to get his wallet, someone put a knife to his throat and demanded his money and car keys. One of the men punched him in the stomach and he struggled to get the knife away from his neck. He bit the person wielding the knife and managed to wrest control of the knife. He then accidentally "cut the person

holding the knife" before managing to escape. He denied raping anyone, writing, "Honest to god I did not rape no one, we had sex twice and safely too."

The appellant testified on direct examination at the suppression hearing about the trip to the bathroom:

Q. Do you remember a point when you left [the interview room] to go to the bathroom?

A. Yes, sir.

Q. *What happened on your way back from the bathroom?*

A. *I was being told that it's best for me to tell my side of the story, and the officer was letting me know that all the evidence pointing to me, that they have the witness statement placing me at the scene.*

Q. And how did that make you feel?

A. Fear and intimidated.

Q. *Well, why did them telling you that they had witness statements and they had evidence against you make you afraid and intimidated?*

A. *Because they talking about I will never see my Corolla (phonetic) again,[5] and he was asking me if I got kids, and I'll never see my kids again.*

Q. *Now, was this Detective Taylor that was telling you this?*

A. *Yes, sir.*

Q. Now, when he told you that stuff about not being able to see your kids again and not being able to see your girl again, you said that put you in fear?

A. Yes, sir.

Q. Did you say anything in response to that?

A. I tell him no, none of this ain't true and I want a lawyer.

---

5. From later context, it appears that the appellant was referring to his girlfriend when he said what sounded like "Corolla."

Q. Okay. And did Detective Taylor or, at the time, Sergeant Bingley say anything in response to you saying you wanted a lawyer?

A. *I keep telling them I want a lawyer, and they keep telling me it's best I just go on with this. You know, basically, I wasn't getting nowhere with them.*

(Emphasis added.)

Further, the appellant testified:

Q. *Now, after you told them again that you wanted a lawyer on the way back, what, if anything, did they say to you then?*

A. *They're telling me that they have all the evidence, you know, telling me they have all the evidence against me, the witness against—they have witness statement against me, the victim statement against me, everything pointing me on the scene, and they have all the evidence against me.*

Q. And how did that make you feel?

A. Fear.

(Emphasis added.) The appellant said that this fear caused him to change his mind and decide to give a written statement even though he did not have a lawyer present. When asked what he was afraid of, the appellant replied, "[t]he fact that I won't be able to see my kids again." He testified that that was the only reason he gave a statement, "[b]ecause I'm not guilty of this."

When asked on cross-examination how many times Sergeant Taylor had told him about all the evidence against him, the appellant replied, "Ma'am, to be honest, he was a nag with it." The appellant added that Sergeant Taylor had told him several things, including that "[a]ll the evidence pointing to me, right? They have the witness statements against me, and the evidence planted me at the scene"; and that "I won't see my family again." The cross-examination continued as follows:

Q. Um-hmm. And all of this happened on the 20 steps from after you used the bathroom, back to the interview room, right?

A. From that point, going and coming.

Q. Now it's going and coming.

A. Well, ma'am—

Q. On direct you said it was on your way back. So is it going and coming or just on the way back? You have to choose one.

A. Well, I wasn't walking with myself, ma'am.

Q. Right. But when your lawyer asked you when was it, you said it was on the way back from the bathroom.

A. That was what he said.

Q. Now, when I asked you—let me finish my question so we're clear. When I asked you, you said it was on the way going and coming. So my question to you now, sir, was that on the way to the bathroom and coming or just back from the bathroom?

A. Ma'am, I can remember clearly, right, he was putting these argument [sic] to me, right, at the fountain, coming up, right? So these was his argument, these was his words to me, that I need to make a statement.

Q. Coming—passing—you mean the water fountain?

A. Where I went.

Q. Okay. So from the bathroom, back to the interview room.

A. Yes, ma'am.

After the appellant testified, the defense rested. At that point, the prosecutor sought a continuance to call Sergeant Taylor, asserting that the sergeant was in Las Vegas and would not be back for about five days. Defense counsel objected, noting that Sergeant Taylor had been present at the most recent prior motion hearing and it would have been no surprise to the State that his testimony would be important at the suppression hearing. After hearing additional argument from the prosecutor, the court denied the motion for continu-

ance, stating, "I think I probably have enough evidence in front of me at this point to make a determination."

The court entertained argument on the motion to suppress. Defense counsel maintained that the appellant's written and audiotaped statements, and the photographs of his injuries, should be suppressed on the ground that the appellant was in custody and had invoked his right to counsel but nevertheless had been subjected to the functional equivalent of interrogation, which resulted in his statements to the police. Specifically referring to *Blake v. State*, 381 Md. 218, 849 A.2d 410 (2004), *cert. granted*, 544 U.S. 973, 125 S.Ct. 1823, 161 L.Ed.2d 722, *cert. dismissed*, 546 U.S. 72, 126 S.Ct. 602, 163 L.Ed.2d 406 (2005), defense counsel argued that "[t]he burden is on the State to prove that after invoking his or her right to counsel, that the accused initiated further discussions with the police." Defense counsel also observed that the pertinent test focuses on "the defendant's perspective rather than on the police officer's intent." 381 Md. at 233–34, 849 A.2d 410.

Defense counsel further argued that the audiotape showed that the appellant asked for a lawyer at least twice: once to Detective Prince and once to Lieutenant Bingley. The police photographer questioned him thereafter ("show me where else you were injured"). Moreover, Lieutenant Bingley's response to the appellant, that he could speak to a lawyer at the preliminary hearing, was misleading because the appellant "doesn't know when the preliminary hearing date is. He doesn't know how far out that is going to be." Noting that "we don't know what happened out in that corridor on the way to and from" the bathroom, defense counsel expressed skepticism that, in the five minutes between when he was taken to the bathroom and when he returned to the interview room, the appellant suddenly changed his mind about wanting a lawyer without anything being said to him to prompt a change of mind. Defense counsel argued that, considering the portions of Sergeant Taylor's remarks that could be heard on the audiotape, as well as the appellant's testimony that Sergeant Taylor told him he would not see his children again, the

appellant had been subjected to the functional equivalent of interrogation after he had invoked his right to counsel.

In response, the prosecutor agreed that the appellant had asked for a lawyer initially but argued that the appellant initiated conversations with the detectives thereafter, repeatedly, "saying to the police I want to talk to you, I want to talk to you, can I tell my story, can I tell my story." With respect to the appellant's testimony about what Sergeant Taylor said to him during the trip to the bathroom, the prosecutor argued that the appellant simply was not credible because he had given conflicting testimony about whether Sergeant Taylor's remarks concerning the evidence and the appellant's family were made on the way to or on the way back from the bathroom, or both.

In rebuttal argument, defense counsel disagreed that the appellant had initiated any conversation with the police, asserting: ₒ

The only point that could be considered him initiating conversation is when Detective Bingley testified that he was well outside in the bathroom, that he stated that he wanted to give a statement. Which, again, seems unbelievable that for the prior three hours he was saying no, I want to talk to a lawyer, I want to talk to a lawyer, I want to talk to a lawyer, then as soon as he goes to the bathroom, he immediately starts asking, I want to make a statement.

I believe, also, that what Sergeant Taylor said also [on the audiotape] contradicts Sergeant Bingley, who was the detective. Sorry. Sergeant Taylor stated on the tape, that you can clearly hear, "It's okay; we don't want your statement anyway; we have everything; points to you."

The way he made that sound, it was saying—it sounded as though he was responding, you know, you didn't give a statement; we don't need your statement anyway; because of all this evidence we already have against you, we don't need your statement, which is, I think, a reasonable person would say, well, if you don't need my statement, maybe I should give you my statement to tell my side of the story,

because everything you have against me is a lie. That is what went through Mr. Henry's head. That is what he testified to. That's what he felt was that way.

The court held the motion *sub curia* and the next day granted it in part and denied it in part. The court announced its ruling on the record, finding that the appellant initially invoked his right to counsel and that anything he said thereafter to Detective Prince would be suppressed and that the photographs of the appellant's arms taken after the photographer asked about any other injuries, and the appellant's remarks to the photographer, also would be suppressed. The court ruled not to suppress the statements made by the appellant after the return from the bathroom, however, making the following factual findings concerning what took place during that trip:

> The defendant's testimony was not credible. The story changed on cross-examination. It was contradicted credibly by Sergeant Bingley, who testified that defendant asked to talk after asking if he had been charged in this case.
>
> As well, in the [audiotape] recorded testimony of Officer Taylor, the officer said the opposite of that which is alleged by the defendant [*i.e.*, what could be heard as words spoken by Sergeant Taylor on the audiotape].

The court reasoned that the State had proven that the appellant had waived his prior request for counsel "by initiating the request to make a statement" and that Sergeant Taylor had not engaged in activities that were reasonably likely to elicit an incriminating response. The court found "that the State has met its burden of proving that the defendant validly waived the earlier request for an attorney by subsequently initiating requests and repeatedly asking to tell his version of what happened."

The court discounted Sergeant Taylor's remark (on the audiotape, as the three were re-entering the interview room) that the appellant should not talk, and that the police would be unable to use any statements, in light of the defendant's invocation of his right to counsel, ruling that it did not

constitute the functional equivalent of an interrogation. The court distinguished the case from *Blake* on several grounds, including that Blake was only 17 years old and uneducated, that he had been given charging documents that mistakenly said he was facing the death penalty, and that the officer in *Blake* was "confrontational."

## B.

### *Analysis*

"It is established law that once a defendant, 'detained in a custodial setting, has asserted his right to counsel, all interrogation must cease until an attorney has been furnished to consult with him or he initiates further communication, exchange or conversations.'" *Williams v. State,* 342 Md. 724, 760, 679 A.2d 1106 (1996) (quoting *State v. Conover,* 312 Md. 33, 38, 537 A.2d 1167 (1988)). *See also Phillips v. State,* 425 Md. 210, 217–218 40 A.3d 25 (2012).

In the seminal case of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, the Supreme Court explained:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [A]n accused ..., having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484–85, 101 S.Ct. 1880 (footnote omitted); *see also Miranda,* 384 U.S. at 474, 86 S.Ct. 1602 ("If the individual states that he wants an attorney, the interrogation must cease until an attorney is present").

The Supreme Court has further explained that:

> The rationale of *Edwards* is that once a suspect indicates that "he is not capable of undergoing [custodial] questioning

without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect."

*Maryland v. Shatzer,* —— U.S. ——, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045 (2010) (quoting *Arizona v. Roberson,* 486 U.S. 675, 681, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988)). Further:

Under this rule, a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel. The implicit assumption, of course, is that the subsequent requests for interrogation pose a significantly greater risk of coercion. That increased risk results not only from the police's persistence in trying to get the suspect to talk, but also from the continued pressure that begins when the individual is taken into custody as a suspect and sought to be interrogated— pressure likely to "increase as custody is prolonged. . . ."

*Shatzer,* —— U.S. at ——, 130 S.Ct. at 1219–20 (citing *Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990)).

Thus, once a suspect in a criminal case has invoked his right to counsel, "[a] constitutionally valid statement may be obtained by the police in two ways: if the suspect initiates further conversation with the police or if an attorney has been made available to the suspect." *Blake v. State,* 381 Md. at 231–32, 849 A.2d 410. A statement obtained from the suspect will not be constitutionally valid, and therefore will not be admissible, if, after invoking his right to counsel, the suspect is interrogated or subject to the functional equivalent of interrogation. *Edwards,* 451 U.S. at 484–86, 101 S.Ct. 1880.

The functional equivalent of interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reason-

ably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnotes omitted); *see Drury v. State,* 368 Md. 331, 337, 793 A.2d 567 (functional equivalent of interrogation occurred when, before being given his *Miranda* warnings, the defendant was placed in an interrogation room, shown evidence recovered from the crime scene, and advised that these items would be tested for fingerprints), *cert. denied,* 537 U.S. 942, 123 S.Ct. 341, 154 L.Ed.2d 249 (2002). In assessing on appellate review whether a suspect was subjected to the functional equivalent of interrogation, we focus "on the defendant's perspective rather than on the police officer's intent." *Blake,* 381 Md. at 233–34, 849 A.2d 410 (citing *Arizona v. Mauro,* 481 U.S. 520, 528, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987)).

As the discussion above makes clear, when a suspect in custody has invoked his right to counsel and thereafter makes an inculpatory statement to the police, without a lawyer present, it is presumed, under *Edwards,* that the statement was not voluntarily given, *i.e.,* that it was the product of interrogation or its functional equivalent and was not given as a consequence of the suspect's initiating communication with the police. *Shatzer,* 130 S.Ct. at 1219–20 (discussing the "*Edwards* presumption of involuntariness"). For the statement to be admissible, the State must prove by a preponderance of the evidence that the suspect initiated further discussion with the police. *Blake,* 381 Md. at 232, 849 A.2d 410.

In *Phillips,* the Court explained our standard of review as follows:

[W]e examine [the court's denial of the defendant's motion to suppress] based on what was alleged in the motion to suppress and the evidence admitted at the suppression hearing. We view that evidence in a light most favorable to the State, which prevailed on the motion. That said, we must, in the end, make our own independent Constitutional

appraisal of whether the statements were obtained in violation of law.

425 Md. at 27, 40 A.3d 25 (citations omitted).

In the case at bar, it is undisputed that the appellant was in police custody and that he invoked his right to counsel. The appellant contends that, thereafter, he did not initiate communications with the detectives. Rather, he was subjected to the functional equivalent of interrogation by Sergeant. Taylor, at Sergeant Taylor's initiative, during the bathroom trip. He argues that the same principles of proof established by the Court of Appeals in *Streams v. State*, 238 Md. 278, 208 A.2d 614 (1965), and *Gill v. State*, 265 Md. 350, 289 A.2d 575 (1972), in the context of the voluntariness under Maryland non-constitutional law of statements made to the police by a suspect in custody, apply in this setting as well, given the *Edwards* presumption; and that, under those principles, there was a gap in the evidence that necessarily resulted in the State's failing to satisfy its burden of proof. The appellant also asserts that the motion judge's negative credibility finding was based upon a misunderstanding of the testimony.

The State responds that the motion court's factual findings were supported by the evidence; that the argument about the applicability of *Streams* and *Gill* was not made below, and therefore is not preserved for review; and that the record discloses that Sergeant Taylor neither interrogated the appellant nor engaged in conduct that was its functional equivalent. Rather, the appellant initiated conversation with the police after he had invoked his right to counsel, thus waiving the prior invocation.

The critical time frame for purposes of this issue is the approximately four minutes from when the appellant was removed from the interview room until he was returned to it, during which he and Sergeant Taylor and Lieutenant Bingley walked up the hall to the bathroom, the appellant used the bathroom in Sergeant Taylor's presence, and the appellant and the two officers walked back down the hall and re-entered

the interview room.[6] At the outset of that time period, the appellant's right to counsel had been invoked and remained so, and the police were prohibited from interrogating him or engaging in the functional equivalent of interrogation. By the end of that time period, immediately after the appellant re-entered the interview room, he was saying that he wanted to speak and give "his side of the story."

The critical question at the suppression hearing was whether the State met its burden of proving that, during the bathroom trip, the appellant initiated communication with the police and that his statements therefore resulted from that initiation and not from police interrogation or its functional equivalent. The sum total of relevant evidence at the suppression hearing about the bathroom trip was:

- *Lieutenant Bingley's version:* As the appellant was being escorted to the bathroom, he was asking what the charges were against him; on the way back from the bathroom, Sergeant Taylor was "leading the conversation"; the lieutenant did not remember what Sergeant Taylor was saying to the appellant; however, "[t]he whole way down and back from the bathroom, [the appellant] was begging" to give "his side of the story."

- *The appellant's version:* On the way back from the bathroom, Sergeant Taylor told him, "it's best for [the appellant] to tell [his] side of the story," that all the evidence was pointing to him, that a witness statement placed him at the scene, and that he would never see his girlfriend or his children again.

- *The audiotape:* As Lieutenant Bingley, Sergeant Taylor, and the appellant were reentering the interview room, Sergeant Taylor was telling the appellant "it's better that

---

**6.** On the audiotape, the bathroom break begins at 03:12:32. The pause in the recording then continues for approximately four minutes, when Sergeant Taylor's voice is heard as he, Lieutenant Bingley, and the appellant re-enter the interview room at 03:16:25. Again, the tape itself only was admitted into evidence at trial.

you don't give us your statement because all the evidence points to . . . is all ours."

- *Sergeant Taylor:* No testimony given.

The appellant argues that, in the absence of any testimony from Sergeant Taylor about what he (Sergeant Taylor) was saying to him (the appellant) during the bathroom trip, the State necessarily failed to satisfy its burden of proving that the appellant's written and oral statements, made immediately after the bathroom trip, resulted from his initiating conversation with Sergeant Taylor and not from interrogation or the functional equivalent of interrogation by Sergeant Taylor. Specifically, although Lieutenant Bingley testified that the appellant was saying he wanted to tell his side of the story, she also testified that Sergeant Taylor was "leading the conversation" during the bathroom trip and that she could not remember what the sergeant was telling the appellant. Thus, Lieutenant Bingley's testimony showed only what she heard the appellant say (that he wanted to talk) and not what Sergeant Taylor was telling the appellant at that same time, which was crucial. The audiotape revealed one small part of what Sergeant Taylor had said, at the very end of the conversation, but did not offer proof of what was said during the bathroom trip. Only the appellant testified about what Sergeant Taylor said to him on the bathroom trip. His testimony was unrebutted; but the trial court did not believe it.

In *Streams* and *Gill,* the cases the appellant argues adopt principles of proof that apply to this case, even though they address voluntariness of confessions under Maryland non-constitutional law, the Court of Appeals held that evidence of involuntariness must be rebutted for the State to meet its burden of proof. In *Streams,* at a hearing on a motion to suppress, the defendant testified that he confessed after Sergeant Tabeling and Officer Butler told him:

[I]t would be better for him if he made a statement because if he did they would try to get him put on probation [and that] Officer Butler told him if he did not sign a statement

" * * * he'd throw the book at me, get me more time, that's all."

*Streams*, 238 Md. at 281, 208 A.2d 614. The State did not call any witnesses to rebut the defendant's testimony about what the officers said to him before he confessed. The motion court denied the motion to suppress and the confessions were admitted into evidence.

On appeal after conviction, the Court of Appeals reversed, holding that, without putting on evidence to rebut the defendant's testimony, the State had failed, as a matter of law, to meet its burden of showing that the confessions were voluntary. The Court explained:

> After Streams testified, the State chose not to refute his claim that he was promised official help in getting probation if he confessed—which to him could have been fully consistent with and have buttressed the statement he would be taken home after being questioned—nor did it then choose to specifically deny his claim that Officer Butler threatened him with long sentences if he did not confess.

> We think the State's failure, after Streams left the stand, to go forward with testimony which would refute his claim of promises and threats and to show the conduct of the police during the period he was in custody of the arresting officers was enough under the circumstances of this case to require a holding that the judgments appealed from must be reversed because the State did not meet its burden of establishing the voluntariness of the confessions as a prerequisite to their admission in evidence.

*Id.* at 282–83, 208 A.2d 614. The case was remanded for a new trial. The opinion says nothing about whether the motion court believed or disbelieved the defendant's testimony at the suppression hearing. It would appear that the motion court did not believe the defendant; but it also would appear from the Court's holding that the motion court's credibility assessment against the defendant would make no difference in the outcome. Without rebutting the defendant's testimony, even

if the testimony was not credible, the State failed to meet its burden of proof.

In *Gill*, the defendant claimed that his confession was induced by Detective Hyson in that, when they were alone, Detective Hyson threatened him by saying that the police would arrest his girlfriend if he did not confess. Although the defendant's testimony generally was repudiated by another detective, Detective Hyson did not testify. The confession was ruled admissible and the defendant was convicted. Ultimately, the Court of Appeals reversed and remanded for a new trial. It explained:

> [B]efore a suspect's statement can be received in evidence the State has the affirmative duty of showing it was freely made and not the product of promises or threats. This does not require that each person who had casual contact with the accused, once he was in police custody or being interrogated, must testify to the voluntariness of the confession in order for the prosecution to satisfy its burden. But when it is contended that someone employed coercive tactics to obtain inculpatory statements, the charge must be rebutted. Here it is claimed the inducement occurred while Gill was alone with Hyson. Since it is uncontradicted that the suspect was in fact in the sole presence of this police interrogator, that specific person must rebut the allegations of coercion as no one else is qualified to do so.

*Gill*, 265 Md. at 353–54, 289 A.2d 575.

*Streams* and *Gill* remain good law. *See Hill v. State*, 418 Md. 62, 81 n. 5, 12 A.3d 1193 (2011) ("Our cases make plain that, when a defendant testifies that the police used coercive tactics to obtain inculpatory statements, the State must rebut the defendant's testimony."); *Knight v. State*, 381 Md. 517, 532, 850 A.2d 1179 (2004) (stating that, "[w]hen a criminal defendant claims that his or her confession was involuntary because of a promise made to him or her by the interrogating officers, the State must present evidence in order to refute the claim."); *Winder v. State*, 362 Md. 275, 306, 765 A.2d 97 (2001) (stating that, when a pretrial suppres-

sion motion is filed on the issue of voluntariness of a confession, the State bears the burden of proving by a preponderance of the evidence that "the inculpatory statement was freely and voluntarily made and thus was the product of neither a promise nor a threat."). It is implicit in the opinions in these cases that the credibility of the defendant's testimony at the suppression hearing is not an issue unless the State has met its initial burden of putting on evidence to rebut what the defendant testified to.

■ The State in the case at bar takes the position that the argument the appellant advances based upon the *Streams* line of cases is not preserved for review, in that defense counsel not only did not argue those cases below but also opposed the State's motion to continue the suppression hearing in order to obtain Sergeant Taylor's testimony. On the merits, the State asserts that the motion court "expressly credited Sergeant Bingley's testimony on this point, finding that [the appellant's] testimony 'was contradicted credibly by Sergeant Bingley, who testified that [the appellant] asked to talk after asking if he had been charged in this case.' "

We find no merit in the State's preservation argument and further conclude that, given the holdings in *Edwards* and its progeny, the principles of proof adopted in *Streams* and *Gill*, although in the context of Maryland non-constitutional law of voluntariness of confessions, apply with equal force to confessions elicited after the invocation of the right to counsel.

The Fifth Amendment protection against compelled self-incrimination, applicable to the states through the Fourteenth Amendment, *see Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), is at the heart of the *Miranda* and *Edwards* line of cases. The Supreme Court explained in *Shatzer* that it adopted *Miranda* warnings as a rule decades ago as "a set of prophylactic measures to protect a suspect's Fifth Amendment right [against compelled testimony] from the 'inherently compelling pressures of custodial interrogation.' " 130 S.Ct. at 1218 (quoting *Miranda*, 384 U.S. at 467, 86 S.Ct. 1602). When a suspect responds to the *Miranda* warn-

ings by stating "that he wants an attorney, the interrogation must cease until an attorney is present." *Shatzer,* at 1219. Later, the Supreme Court adopted the *Edwards* "presumption of involuntariness" rule as an "additional safeguard" against involuntary waiver, beyond the safeguards established in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), for those suspects who have invoked their right to counsel.[7] It did so to ensure that a suspect who has done so cannot lose that right through waiver unless there is an additional showing that the waiver itself was not compelled. *Shatzer,* 130 S.Ct. at 1219.

The *Shatzer* Court explained the rationale of the *Edwards* presumption as follows:

> [O]nce a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Arizona v. Roberson,* 486 U.S. 675, 681 [108 S.Ct. 2093, 100 L.Ed.2d 704] (1988). Under this rule, a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel. The implicit assumption, of course, is that the subsequent re-

---

7. Clearly, the *Edwards* "presumption of involuntariness" arises as soon as the right to counsel is invoked, regardless of whether the suspect makes the invocation after being read his *Miranda* rights or is knowledgeable enough, as here, to invoke the right to counsel before being read his rights. *See Phillips v. State, supra,* 425 Md. at 26, 40 A.3d 25 (observing that "[n]early every competent person over the age of a toddler who has ever watched television knows the name *Miranda*" and "from watching a 'gazillion' crime shows, ... correctly associate[s] it with the requirement that, when the police detain a person for questioning in a custodial setting, they must inform the person of the right to remain silent, that anything the person says may be used in evidence, *that the person has a right to consult with an attorney before responding to questioning,* and that the attorney will be appointed if the person is indigent") (citation to *Miranda* omitted) (emphasis supplied).

quests for interrogation pose a significantly greater risk of coercion. That increased risk results not only from the police's persistence in trying to get the suspect to talk, but also from the continued pressure that begins when the individual is taken into custody as a suspect and sought to be interrogated—pressure likely to "increase as custody is prolonged," *Minnick v. Mississippi,* 498 U.S. 146, 153 [111 S.Ct. 486, 112 L.Ed.2d 489] (1990). The *Edwards* presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of "prolonged police custody," *Roberson,* 486 U.S., at 686 [108 S.Ct. 2093], by repeatedly attempting to question a suspect who previously requested counsel until the suspect is "badgered into submission," *id.,* at 690 [108 S.Ct. 2093] (Kennedy, J., dissenting).

*Id.* at 1219–20.

■ Just as the *Miranda* and *Edwards* rules were fashioned to safeguard the Fifth Amendment right to be free from compelled self-incrimination, the rule requiring rebuttal of a suspect's testimony about involuntariness of a confession, as developed in *Streams* and its progeny, was designed to protect that same basic right. The *Streams* rebuttal rule is, in essence, a presumption of involuntariness that arises when evidence is adduced that a confession was obtained by improper threats, promises, or inducements. For the State to introduce the confession in evidence, it must adduce specifically contrary evidence, thus rebutting the presumption of involuntariness. If it fails to do so, the presumption remains that the confession is involuntary.

■ We reject the State's preservation argument because, regardless of whether *Streams* and *Gill* were cited, the issue at play under *Edwards* was the effect of the unrebutted presumption of involuntariness on the State's burden of proof, as a matter of law, which is the same issue the Court of Appeals has addressed in the *Streams* and *Gill* line of cases. Thus, the issue was raised below. Moreover, the issue plainly was not forfeited by defense counsel when he opposed the

State's request for a five-day postponement to obtain the testimony of Sergeant Taylor. The postponement request revealed that the State knew that Sergeant Taylor's testimony was needed to rebut the appellant's testimony. The State should have known that well before the suppression hearing, and, as the defense argued, Sergeant Taylor was present at prior hearings in the case. It hardly could be said that the defense waived the State's burden of proof by opposing its request to postpone the hearing to obtain a witness it should have known was needed for it to satisfy its burden of proof.

The state of the evidence at the suppression hearing, as we have summarized it above, was that the appellant invoked his right to counsel; counsel never was present; during the bathroom trip, he said he wanted to tell his side of the story; also during the bathroom trip, Sergeant Taylor was "leading a conversation" with the appellant, the contents of which was not testified to by any witness other than the appellant; and, according to the appellant, Sergeant Taylor told him that it was "best for him to tell [his] side of the story," that all the evidence was pointing to him, that a witness statement placed him at the scene, and that he would never see his girlfriend or his children again. The remarks the appellant testified Sergeant Taylor made to him were the functional equivalent of interrogation; they were reasonably likely to elicit a response from the appellant.

There was no evidence admitted at the hearing that rebutted what the appellant testified Sergeant Taylor had said to him, as Sergeant Taylor was not there to testify and Lieutenant Bingley's testimony that Sergeant Taylor was speaking to the appellant during the bathroom trip, and indeed was "leading the conversation," did not rebut the appellant's testimony; indeed, it supported it. The only evidence of something said by Sergeant Taylor was the recording of the conversation that took place when the three were re-entering the interview room (at which time the detectives would know that their comments were once again being recorded)—not the conversation that took place in the hallway. Sergeant Taylor's remark,

back in the interview room, that it was not necessary for the appellant to give a statement, as the State already had all of the evidence against him, did not rebut the appellant's testimony about what Sergeant Taylor had said to him in the hallway.

Not only did none of the testimony rebut the appellant's testimony, none of it showed that the discussion in the hallway about the appellant giving a statement was initiated by the appellant. The remarks by Sergeant Taylor that were captured on audiotape as the three reentered the interview room could be interpreted several different ways, whether as an exhortation against talking or as an implicit challenge to speak up against the evidence the police claimed to have gathered. It did not rebut what the appellant had testified had been said to him in the hallway by Sergeant Taylor, however, and did not show that the conversation in the hallway was initiated by the appellant.

On the evidence that was adduced at the suppression hearing, which did not include any statement by Sergeant Taylor (or anyone else) contrary to the version of events given by the appellant, the State failed to rebut the *Edwards* presumption of involuntariness. For the reasons we have explained, it matters not that the motion judge did not credit the appellant's testimony. The burden to prove voluntariness rested on the State and could not be satisfied simply by arguing, or persuading a fact finder, that the appellant was not telling the truth. The appellant had invoked his right to counsel before the police and two hours later he gave an inculpatory statement to the police. The State bore the burden of proving the statement was voluntary, in that the appellant had not been compelled to waive the right he had invoked to speak only, if at all, with counsel present, and instead had instigated the conversation with the police that culminated in the statement. The State did not present any such evidence. *See, e.g., Winder*, 362 Md. at 306, 765 A.2d 97 ("When the voluntariness of a confession is challenged properly, the State carries the burden of 'showing affirmatively that the inculpatory statement was freely and voluntarily made and thus was the

product of neither a promise nor a threat.'") (quoting *Hillard v. State*, 286 Md. 145, 151, 406 A.2d 415 (1979)).[8]

 Having concluded that the motion court erred by not suppressing the appellant's statement, we must determine whether that error was harmless beyond a reasonable doubt. Recently, the Court of Appeals restated the well-established rule for harmless error analysis:

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

*Morris v. State*, 418 Md. 194, 221–222, 13 A.3d 1206 (2011) (quoting *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976) (footnote omitted)); *see also Arizona v. Fulminante*, 499 U.S. 279, 302, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (holding that admission of an involuntary confession is subject to harmless error analysis); *State v. Logan*, 394 Md. 378, 387–91, 906 A.2d 374 (2006) (applying harmless error analysis to a Miranda violation but holding error was not harmless beyond a reasonable doubt).

In this case, the appellant admitted having sex with "Tasha," *i.e.*, Mark, in exchange for money about a week before the underlying incident both in his written statement and his

---

**8.** We note that the credibility finding by the motion judge, although not of consequence, was not firmly grounded in the evidence. The appellant's testimony about when during the walk to the bathroom Sergeant Taylor made the various remarks about urging him to speak, that he would not see his girlfriend or children again, etc., was not internally inconsistent. He gave different times in the bathroom trip based upon how the questions to him were phrased. Also, the significant portion of the appellant's testimony was not undercut by Lieutenant Bingley's testimony, as the lieutenant could not say what Sergeant Taylor had said to the appellant.

oral statements captured on the audiotape. In both, he acknowledged meeting Tasha in Virginia to purchase marijuana; and described their meeting two other men and an ensuing incident in which Tasha put a knife to his neck and she and the men attempted to rob him. During the course of the struggle, the appellant obtained control of the knife and "cut the person holding the knife." He stated in the interview that he "pushed the knife towards them...." He also stated in the interview that he believed he had cut Tasha on her hand.

This evidence, if credited by the jury, was sufficient to establish the essential elements of second-degree assault of Mark, the only charge the appellant was convicted of. Thus, the error was not harmless beyond a reasonable doubt.

Accordingly, for these reasons and because, as we shall discuss below, the appellant's right to a speedy trial was not violated, we shall vacate the judgment and remand this case to the circuit court for further proceedings. *See, e.g., Southern v. State*, 371 Md. 93, 112, 807 A.2d 13 (2002) (when the State was on notice of the suppression challenge, but offered no evidence as to the constitutionality of a detention, "[t]he appropriate appellate response is a reversal with a new trial, not a remand for the taking of additional evidence in a reopened suppression proceeding in the same case").

## II.

### Speedy Trial

The appellant was arrested and charged by criminal information on February 7, 2009. He was indicted on March 17, 2009. Two days later, he was committed to the Prince George's County Detention Center, without bail. On April 10, 2009, the appellant appeared in the circuit court and was referred to the Office of the Public Defender. On May 5, 2009, a public defender entered his appearance, filed a motion for discovery, and demanded a speedy trial. Trial was scheduled to commence on August 10, 2009.

On July 10, 2009, the prosecutor informed the assigned trial judge the State would be filing a motion to continue the trial date because the prosecutor was scheduled to try another rape case on the same day this case was set for trial. The prosecutor then filed a written motion for continuance, noting that defense counsel had no objection. The administrative judge rescheduled the trial date to September 29, 2009.

A hearing on motions was scheduled for September 3, 2009. On that date, counsel for the parties appeared before the administrative judge and informed him that the assigned trial judge was unavailable. The prosecutor then asked for a continuance because certain DNA testing had not been completed and that evidence was unavailable. Defense counsel objected to the motion for continuance, noting that the appellant had been incarcerated since his arrest. After the State informed the court that it had just been notified the day before that the DNA testing was incomplete, the administrative judge made the following observations:

Okay. Well, then you—both of you correct me if you believe I'm putting forth any inaccurate information about this. It is my understanding from my information given to me over the past two or three years, for a great period of time, probably two and a half years now, the drug lab was essentially shut down by virtue of the fact that now the DNA lab—I'm sorry—was for the last two and a half years essentially inoperable because of the departures of staff, director, and DNA analysts who had left their employment with Prince George's and went to either state or private sources.

So that up until recently, within the last six months or so, I believe all of those earlier matters that were requested of them to do DNA analysis had to be sourced outside the confines of the DNA lab. And that the ongoing efforts of the Prince George's County Police Department to seek qualified people to serve as both director and analyst at the DNA lab continued over that period of time.

Recently, as I understand it, the last six months, they have managed to secure an analyst and director of the lab.

It's back in operation. However, they do—because of the newly re-instituted operation now that the cases are going to them have—a somewhat serious backlog of DNA analysis requests.

Hearing no dispute about his understanding of the backlog at the DNA lab, the administrative judge found good cause to postpone the trial date, even beyond the 180–day *Hicks* limit,[9] "because of the unique and extraordinary circumstances" concerning the unavailability of the scientific evidence. Trial was reset for November 9, 2009.

On September 14, 2009, defense counsel filed a motion to set a reasonable bond and a request for a hearing. He asserted that the appellant had been incarcerated since February 7, 2009. The motion did not include a demand for a speedy trial or an argument on that issue. The prosecutor opposed the motion, noting that this was a first-degree rape case and that the appellant had a prior conviction. The record does not reveal any ruling on this motion, so it was effectively denied.

On October 29–30, 2009, the assigned trial judge heard the appellant's motion to suppress. Also on October 30, 2009, the prosecutor again asked the administrative judge for a continuance of the trial date because of the unavailability of the DNA evidence. Defense counsel objected to any continuance, noting that the appellant still was incarcerated. Defense counsel remarked that "the United States Constitutional speedy trial rights will be coming into question now that he has been incarcerated at no bond." The administrative judge *denied* the motion for a continuance, as follows:

> [T]his certainly is, and I know that the commitment last time, on the last occasion was that the DNA would be completed by the new trial date.
>
> Nine months is a good amount of time in this case, and I thought it reasonable, based on the seriousness of the

---

**9.** *See State v. Hicks*, 285 Md. 310, 403 A.2d 356 (1979); *see also* Md. Rule 4–271; Md.Code (2001, 2008 Repl.Vol.), § 6–103 of the Criminal Procedure Article. Although the appellant contended below that there was a *Hicks* violation, he does not maintain that argument on appeal.

charges, certainly, and the fact of the back up at the DNA lab. And now they had one employee, as I understand it, who was actually capable of examining and processing results in this fashion. But it can't go on forever, and with all due respect, your motion is denied.

On November 9, 2009, at the outset of the proceedings, defense counsel informed the trial judge that he had received the DNA report only that morning, and moved to exclude all DNA evidence. Defense counsel argued that the report should be excluded because the prosecutor had failed to timely produce it as required by Md.Code (1973, 2006 Repl.Vol.), section 10–915 of the Courts and Judicial Proceedings Article ("CJP"). In addition, defense counsel complained that the prosecutor just had provided the name of a new expert witness who had not been disclosed previously during discovery, in violation of the discovery rules. Observing that it had been nine months since the appellant's arrest, defense counsel argued:

There is no reasonable explanation for why it was not tested in a more appropriate time for it to have been ready to go to trial today, with not only the evidence being tested, but also so it would be tested in a time so that the defense would know that it was tested, be able to receive the report, prepare for cross-examination, and if we chose to also have the DNA tested by our own experts. Because, at this point, our own experts have not had an opportunity to test or examine this evidence either.

If for some reason this case was continued, it would be very likely that we would not be able to get to this case again, due to various schedules, until probably sometime in January, at the best. There's a possibility it could be done in December, but if we were to have our experts test it as well, it very well could not be until January or February until this case could be going forward to trial, which would then, again, raise constitutional speedy trial right issues as well, which the defense reminds have already been raised by going beyond Hicks for the reasons that have already come up.

After defense counsel concluded his initial argument, the court heard from the prosecutor, who asserted that the State had given the appellant proper notice of its intent to use DNA evidence. Agreeing that he had identified only one expert in connection with this evidence, the prosecutor suggested the proper remedy for any discovery violation was a continuance, not the exclusion of the evidence at trial.

After hearing rebuttal from defense counsel, the court found that the DNA evidence was not precluded by Rule 5–702, which concerns expert testimony, or by Rule 4–263(d)(8), which requires production of expert reports. The court further found that there was no violation of CJP section 10–915, because the appellant was notified timely of the State's intent to use DNA evidence. The court observed that defense counsel did not request DNA evidence pursuant to CJP section 10–915(c)(2). The court then indicated a willingness to refer the case to the administrative judge should the appellant want a continuance.

After hearing and denying the appellant's motion to reconsider its ruling on the motion *in limine* to exclude the DNA evidence, defense counsel moved for a continuance of the trial date. Defense counsel again demanded a speedy trial, stating "we are not waiving [the appellant's] rights to a speedy trial in any way; that we believe while we may be making this request, that this request is not by our choice or by our want, but by purely out of necessity, and I do say purely out of necessity." The judge then sent the matter to the administrative judge.

Before the administrative judge, the appellant requested a continuance of the trial due to the belated disclosure by the State of the DNA evidence. Defense counsel maintained that he was not waiving the appellant's right to a speedy trial, but, in order to effectively represent the appellant, a continuance was necessary. The prosecutor did not oppose the appellant's request for a continuance, and the administrative judge agreed to continue the trial date. Trial was reset for March 15, 2010.

On March 9, 2010, the appellant filed a motion to dismiss for violation of his right to a speedy trial. On March 15, 2010, after a jury had been selected, the trial court heard several motions from the defense, including the speedy trial motion to dismiss. Among other arguments on that motion, defense counsel asked the court to consider whether the State was diligent in having the DNA evidence analyzed.

On March 16, 2010, prior to hearing evidence, the trial court denied the appellant's motion to dismiss for an alleged speedy trial violation. The court found that the length of delay triggered a constitutional speedy trial analysis under *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). It further found that "[c]learly this is a complicated case, and it is a case in which the DNA evidence may provide greater precision." Citing *State v. Kanneh,* 403 Md. 678, 944 A.2d 516 (2008), the court found that "the postponement was largely neutral given that it was primarily necessitated or generated by the need to both produce the DNA report and give the parties sufficient time to explore the DNA report." Finally, the court found that the appellant had asserted his right to a speedy trial but there was "absolutely no evidence whatsoever that the delay has in any way prejudiced the defendant's defense."

The court balanced the factors in *Barker v. Wingo* and found that the appellant's right to a speedy trial had not been violated. On that basis, the court denied the motion to dismiss.

On appeal, the appellant contends the circuit court erred in denying his motion to dismiss for a speedy trial violation, arguing that the approximately 13–month delay was all attributable to the State. The State concedes that the length of delay in this case was of constitutional dimension. It argues, however, that the reasons for the delay were either neutral or did not weigh heavily against it in the ultimate analysis. We agree with the State.

The Sixth Amendment to the United States Constitution, and Article 21 of the Maryland Declaration of

Rights, guarantee a criminal defendant the right to a speedy trial. In assessing on appeal whether a defendant has been denied this constitutional right, we make our own independent examination of the record. *Glover v. State,* 368 Md. 211, 220–21, 792 A.2d 1160 (2002); *accord Jules v. State,* 171 Md.App. 458, 481–82, 910 A.2d 553 (2006), *cert. denied,* 396 Md. 525, 914 A.2d 769 (2007). In so doing, we defer to the circuit court's first level findings of fact unless clearly erroneous. *Glover,* 368 Md. at 221, 792 A.2d 1160 (the *de novo* constitutional appraisal is conducted "in light of the particular facts of the case at hand."). Furthermore, "the review of a speedy trial motion should be 'practical, not illusionary, realistic, not theoretical, and tightly prescribed, not reaching beyond the peculiar facts of the particular case.'" *Brown v. State,* 153 Md.App. 544, 556, 837 A.2d 956 (2003) (quoting *State v. Bailey,* 319 Md. 392, 415, 572 A.2d 544, *cert. denied,* 498 U.S. 841, 111 S.Ct. 118, 112 L.Ed.2d 87 (1990)), *cert. denied,* 380 Md. 618, 846 A.2d 401 (2004).

■ A claim that the Sixth Amendment right to a speedy trial has been violated is assessed under the balancing test announced by the Supreme Court in *Barker v. Wingo, supra. See State v. Kanneh, supra; Divver v. State,* 356 Md. 379, 388, 739 A.2d 71 (1999). In *Barker,* the Supreme Court "rejected a bright-line rule to determine whether a defendant's right to a speedy trial had been violated, and instead adopted 'a balancing test, in which the conduct of both the prosecution and the defendant are weighed.'" *Kanneh,* 403 Md. at 687–88, 944 A.2d 516 (citing *Barker,* 407 U.S. at 530, 92 S.Ct. 2182). Accordingly, four factors are to be considered in determining whether a defendant's right to a speedy trial has been violated: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Kanneh,* 403 Md. at 688, 944 A.2d 516 (citing *Barker,* 407 U.S. at 530, 92 S.Ct. 2182). None of these factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Kanneh,* 403 Md. at 688, 944

A.2d 516 (quoting *Bailey*, 319 Md. at 413–14, 572 A.2d 544, in turn quoting *Barker*, 407 U.S. at 533, 92 S.Ct. 2182).

*Length of Delay:*

The Court of Appeals has stated "that the first factor, the length of the delay, is a 'double enquiry,' because a delay of sufficient length is first required to trigger a speedy trial analysis, and the length of the delay is then considered as one of the factors within that analysis." *Kanneh*, 403 Md. at 688, 944 A.2d 516 (citation omitted). Further,

> [b]ecause whether a period is presumptively prejudicial, or not, depends upon the length of a pre-trial delay, the first factor "is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."

*Divver*, 356 Md. at 388, 739 A.2d 71 (citation omitted).

Here, the appellant was arrested and charged on February 7, 2009, and trial commenced on March 15, 2010. The parties agree that this approximately 13–month delay triggers the *Barker* balancing test. *See Doggett v. United States*, 505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) (delays approaching one year often deemed "presumptively prejudicial").

*Reasons for the Delay:*

All reasons for delay are considered, but some carry greater weight than others:

> Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.

*Barker v. Wingo,* 407 U.S. at 531, 92 S.Ct. 2182; *see also Kanneh,* 403 Md. at 690, 944 A.2d 516 ("In considering this factor, we ... address each postponement of the trial date in turn").

As the appellant implicitly concedes, the initial delay from the February 7, 2009 charging date to the August 10, 2009 initial trial date comprises six months and three days that should be accorded neutral status, and will not be charged to the State. *See Howell v. State,* 87 Md.App. 57, 82, 589 A.2d 90, *cert. denied,* 324 Md. 324, 597 A.2d 421 (1991) ("The span of time from charging to the first scheduled trial date is necessary for the orderly administration of justice, and is accorded neutral status"); *accord Malik v. State,* 152 Md.App. 305, 318, 831 A.2d 1101, *cert. denied,* 378 Md. 618, 837 A.2d 929 (2003).

When, on July 10, 2009, the State moved to continue the trial date due to the unavailability of the prosecutor, there was no objection by defense counsel. As noted, trial was rescheduled by the administrative judge to September 29, 2009. Although there was no objection, this postponement is chargeable to the State. As the Supreme Court has observed, however:

> Unintentional delays caused by overcrowded court dockets or understaffed prosecutors are among the factors to be weighed less heavily than intentional delay, calculated to hamper the defense, in determining whether the Sixth Amendment has been violated but, as we noted in *Barker v. Wingo,* 407 U.S. 514, 531 [92 S.Ct. 2182, 33 L.Ed.2d 101] (1972), they must
>
>> "nevertheless ... be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."

*Strunk v. United States,* 412 U.S. 434, 436, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973); *Wilson v. State,* 281 Md. 640, 654, 382 A.2d 1053, *cert. denied,* 439 U.S. 839, 99 S.Ct. 126, 58 L.Ed.2d 136 (1978) (concluding that delays caused by crowded court dock-

ets and understaffed prosecutors are chargeable to the State, but are weighed less heavily than intentional delay).

On September 3, 2009, the State asked for a continuance because a backlog at the DNA lab had caused certain DNA testing not to have been completed, and that evidence was unavailable. Over defense objection, the administrative judge found good cause to postpone the trial beyond the *Hicks* date. The trial date was reset for November 9, 2009.

Unavailability of DNA test results may be a valid justification for a trial postponement under certain circumstances. *Glover*, 368 Md. at 226, 792 A.2d 1160 (concluding that a postponement as a result of the unavailability of DNA evidence was "both neutral and justified" when there was "no evidence that the State failed to act in a diligent manner"); *accord Kanneh*, 403 Md. at 690, 944 A.2d 516 (postponement resulting from unavailability of State's DNA evidence "largely neutral"). Considering the administrative judge's recollection of the backlog at the DNA laboratory processing DNA evidence, we weigh this postponement less heavily.

Although the State moved one more time for a postponement of trial, on October 30, 2009, that motion was denied. The final postponement of the trial date came at the appellant's request. This occurred on November 9, 2009, when the appellant sought to exclude the DNA evidence he had just received earlier that same day. Although defense counsel maintained that he was not waiving the appellant's speedy trial right, after the trial court denied the motion *in limine* to exclude the DNA evidence, defense counsel requested a continuance from the administrative judge. The State did not contest the request and the trial was reset for March 15, 2010.

To the extent that this request, which postponed the trial date another four months, was mutual, we would conclude that the reason for granting it was neutral. *See Marks v. State*, 84 Md.App. 269, 283, 578 A.2d 828 (1990), *cert. denied*, 321 Md. 502, 583 A.2d 275 (1991) (request for joint continuance is neutral and not chargeable to either party). The request actually was made by defense counsel, however, and ordinarily would be chargeable to the appellant. *See Howell*, 87 Md.

App. at 83–84, 589 A.2d 90 (defendant's request for continuance charged to defendant); *Marks,* 84 Md.App. at 283, 578 A.2d 828 (over four-month delay attributable to defendant since he was not ready to proceed); *see also Ratchford v. State,* 141 Md.App. 354, 362, 785 A.2d 826 (2001), *cert. denied,* 368 Md. 241, 792 A.2d 1178 (2002) (defendant cannot complain about a postponement which he/she requested).

The appellant directs our attention to *Kanneh* and *Glover.* In *Kanneh,* the Court of Appeals held that a 35–month delay in a complicated child abuse case did not violate the respondent's right to a speedy trial. 403 Md. at 684, 944 A.2d 516. Citing *Glover,* the *Kanneh* Court concluded that two postponements because of the unavailability of DNA evidence, when "there is no evidence that the State failed to act in a diligent manner," were "largely neutral" reasons for the delay. 403 Md. at 690, 944 A.2d 516. As explained in more detail in *Glover:*

> While the nature of the charges do not validate automatically a specified duration of delay in trial, *see Bailey,* 319 Md. at 411 [572 A.2d 544] (finding that drug possession and distribution charges, in and of themselves, do not justify a two-year delay), courts must be cognizant of both the degree of complexity associated with a particular charge and the potential impact an adverse verdict would have on the accused. In a murder case, for example, society has an interest in an expeditious trial, *see id.* at 395–96 [572 A.2d 544] (discussing generally the societal interest in providing a speedy trial), but society also has an interest in ensuring that sentences of life imprisonment or death are rendered upon the most exact verdicts possible. DNA evidence may provide that exactness, and to the extent that the delay is not inordinate, society may weigh the precision which DNA evidence potentially provides more heavily than proceeding with a murder trial without such evidence in the name of expediency.

*Glover,* 368 Md. at 224, 792 A.2d 1160.

We reach a similar conclusion here. This was a complex case involving allegations of first-degree rape and other relat-

ed sexual offenses. There was no evidence that the State had failed to act in a diligent manner. Thus, even to the extent that the delays in obtaining DNA evidence were attributable to the State, we weigh them less heavily in the analysis.

*Assertion of the Right:*

The third *Barker* factor concerns the "defendant's responsibility to assert his right." *Barker,* 407 U.S. at 531, 92 S.Ct. 2182. This factor is "closely related" to the other three, and "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* at 531–32, 92 S.Ct. 2182. Here, the appellant first asserted his right to a speedy trial in an omnibus motion filed on May 5, 2009. Defense counsel reasserted the right at the conclusion of the motions hearing on October 30, 2009, when the State asked for but did not receive a continuance. Defense counsel again reasserted the right when, on November 9, 2009, he asked for a continuance of the trial date, but maintained he was not waiving the right to a speedy trial. The appellant clearly asserted his right to a speedy trial.

*Prejudice:*

Finally, the most important factor in the *Barker* analysis is whether the defendant has suffered actual prejudice. *See Jules,* 171 Md.App. at 487, 910 A.2d 553. Regarding this factor, the *Barker* Court itself identified three interests to be protected:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

407 U.S. at 532, 92 S.Ct. 2182; *see also Ratchford*, 141 Md.App. at 361, 785 A.2d 826 ("In terms of showing actual prejudice, moreover, the burden is on the defendant.").

Even though the appellant argues that, during the delay, he suffered anxiety and concern about his family, as well as about his personal and business affairs, we note that he has not set forth how his defense was impaired. At most, the appellant asserts that "what exculpatory information may have been brought to light had [he] been able to meet with counsel more frequently and to assist in the investigation and preparation of [his] defense is simply unknowable." The appellant goes on to assert that, because he was incarcerated from the date he was arrested and charged to his trial date, this 13–month delay was presumptively prejudicial.

The Court of Appeals has explained the difference between presumptive and actual prejudice:

> A problem peculiar to the *Barker* test is its use of the terms *presumption of prejudice* and *actual prejudice*. When there has been a lengthy pretrial delay, one of constitutional dimension, then a presumption arises that the defendant has been deprived of his right to a speedy trial; a presumption of prejudice. Once this presumption asserts itself, a balancing test must be employed which involves a weighing of four factors, one of which is actual prejudice. Actual prejudice involves a consideration of three interests the speedy trial right is meant to protect. Whatever importance it assumes in the final outcome is a function of the facts of the particular case.

*Brady v. State*, 291 Md. 261, 266, 434 A.2d 574 (1981).

We are not persuaded that the appellant's defense actually was prejudiced in this case. Considering the outcome, acquittals on all counts except second-degree assault, it is clear that the appellant was effectively represented at trial and that the trial delay was not so inordinate as to cause actual prejudice to the defense.

*Balancing:*

Under the circumstances in this case, a proper assessment and balancing of the *Barker* factors lead us to conclude that the appellant's constitutional speedy trial right under the Sixth Amendment was not violated. Accordingly, the trial court properly denied the appellant's motion to dismiss.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**