40 A.3d 25

**Charles Robert PHILLIPS**

v.

**STATE of Maryland.**

**No. 58 Sept. Term 2011.**

Court of Appeals of Maryland.

March 16, 2012.

Mark Colvin, Assistant Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Petitioner/Cross–Respondent.

Daniel J. Jawor, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent/Cross–Respondent.

Argued before BELL, C.J., HARRELL, GREENE, ADKINS, BARBERA, ALAN M. WILNER, (Retired, specially assigned), DALE R. CATHELL (Retired, specially assigned), JJ.

WILNER, J.

Regrettably, most people in this country, we suspect, have, at best, little more than a vague familiarity with even the more important pronouncements of the United States Supreme Court. Nearly every competent person over the age of a toddler who has ever watched television knows the name *Miranda*, however.

They not only know the name, but, from watching a "gazillion" crime shows, they correctly associate it with the requirement that, when the police detain a person for questioning in a custodial setting, they must inform the person of the right to remain silent, that anything the person says may be used in evidence, that the person has a right to consult with an attorney before responding to questioning, and that an attorney will be appointed if the person is indigent.[1] Although the precise basis for that bedrock requirement was once somewhat uncertain, it is now clear that the requirement is Constitutionally mandated and that an inculpatory statement elicited in violation of that requirement is inadmissible in the State's case-in-chief. *See Dickerson v. U.S.*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

Our precise concern in this case, though rooted in *Miranda*, is more with what must occur when a suspect invokes his/her right to counsel, and, for that, our patriarch is one of *Miranda's* many children, *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The core holdings in *Edwards* were that:

> (1) an accused "having expressed his desire to deal with the police only through counsel, is not subject to further

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police" and

(2) "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."

*Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85, 68 L.Ed.2d at 386.

It is undisputed here that petitioner Phillips was arrested, taken to a State Police barrack, and subjected to a custodial interrogation, and that, after about 45 minutes of conversation, he expressed a desire to consult with an attorney. It also is undisputed that, following that expression, a police detective continued to engage petitioner in conversation, during which petitioner indicated a desire to continue talking to the detective and ultimately made a number of incriminating statements. The principal question is whether the continuing conversation that led to those statements, for purposes of *Edwards* and *its* progeny, constituted an impermissible custodial interrogation.

## BACKGROUND

Petitioner was convicted by a jury in the Circuit Court for Worcester County of the first degree murder and armed robbery of William Nibblett.[2] He was sentenced to life imprisonment for the murder and a consecutive twenty years for the armed robbery. The Court of Special Appeals, in an unreported opinion, purported to affirm the judgments but remanded the case to the Circuit Court for a determination of whether petitioner was entitled to credit against his sentence for time spent in jail pending trial and sentencing.

---

**2.** The record shows different spellings for the victim's name. The indictment and the State's brief show it as Nibblett. Petitioner's brief has it as Niblett. We shall use Nibblett.

■ We granted Phillips's petition for *certiorari* to determine whether his inculpatory statements were elicited in violation of the ruling in *Edwards*. We also granted the State's cross-petition to determine whether Phillips failed to preserve that issue for appellate review. As both of those issues arise from the Circuit Court's denial of petitioner's motion to suppress the statements, we examine that ruling based on what was alleged in the motion to suppress and the evidence admitted at the suppression hearing. We view that evidence in a light most favorable to the State, which prevailed on the motion. That said, we must, in the end, make our own independent Constitutional appraisal of whether the statements were obtained in violation of law. *Cox v. State*, 421 Md. 630, 642, 28 A.3d 687, 694 (2011); *Longshore v. State*, 399 Md. 486, 498–99, 924 A.2d 1129, 1135 (2007).

The only witness to testify at the suppression hearing was Lieutenant Michael McDermott, of the Worcester County Sheriff's Office. Mr. Nibblett was stabbed to death in his home in Pokomoke City on March 6, 2008. Petitioner was arrested six days later, on March 12, and was transported to the State Police barrack in Salisbury and placed in a conference room with Lt. McDermott. At about 4:15 p.m., Detective Scott Mitchell, of the Pokomoke City Police Department, gave petitioner the *Miranda* advice of rights, and, although the record indicates otherwise, counsel for petitioner concedes that "Phillips signed a written *Miranda* waiver." [3]

---

**3.** Petitioner signed the *Miranda* advice form immediately under the statement that he had read or had read to him the explanation of his rights.

Under his signature was the waiver provision, stating that he understood each of those rights and was "willing to answer questions without consulting a lawyer or having a lawyer present at this time," and under that statement were two signature lines, one denoted as "Signature" and the other denoted as "Witnessed." Inexplicably, Detective Mitchell signed on the signature line, and Detective McDermott signed as the witness. Petitioner did not sign under the waiver provision. Although there is a note in an excerpt from a police report apparently written by a Detective Seibert, who was not present at the time, that "Mr. Phillips waived his rights, agreeing to speak with the investigators," it seems

Following the giving of the *Miranda* advice, Detective Mitchell left the room, and Detective McDermott began to engage petitioner in some general conversation. McDermott said that petitioner did not want to talk about "any involvement in the case" so, in an effort to establish a rapport, the conversation dealt with petitioner's personal life—his family, his tattoos, what he had been doing. After about 45 minutes, Detective Mitchell, whom McDermott described as one of his "zealous" detectives, "barged into the interview process and interrupted it." Mitchell, he said, "became confrontational" with and "somewhat accusatory" of petitioner, indicating that he thought petitioner may have been involved in the homicide, at which point petitioner said that he wanted an attorney. At McDermott's request, Mitchell then left the room.

McDermott stayed with petitioner in the interview room, except when he left briefly to get petitioner a soda. On direct examination, McDermott said that he advised petitioner that his invocation of the right to counsel "meant I couldn't speak to him regarding this case" and that "if he decided he wanted to talk and he wanted to tell the story to me that he could do that. Alls *[sic]* he had to do was say that he wanted to, that he wanted to reaffirm that he didn't want counsel, and that I could talk to him." Petitioner "sat there and thought about it" and decided that he *did* want to continue talking.

---

clear from the advice of rights form itself that petitioner did not sign the written waiver.

The Supreme Court has made clear, however, that, although an express written or oral statement of waiver of the right to counsel usually is strong proof of the *validity* of any waiver, it is not necessary to *establish* a waiver—that an implicit waiver suffices, and that a waiver may be implied through "the defendant's silence coupled with an understanding of his rights and a course of conduct indicating waiver." *Berghuis v. Thompkins,* —— U.S. ——, ——, 130 S.Ct. 2250, 2261, 176 L.Ed.2d 1098, 1112 (2010) citing *North Carolina v. Butler,* 441 U.S. 369, 373, 376, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979). Petitioner does not take issue with the finding of an initial waiver and, indeed, concedes that there was one. For purposes of this case, therefore, we shall assume that petitioner initially waived his right to consult with an attorney and agreed to talk with Detective McDermott.

At that point, Detective Mitchell was called back into the room and watched petitioner while Detective McDermott got a tape recorder. On cross-examination, McDermott added that, prior to petitioner changing his mind, "I told him he could talk to me anytime he wanted to, but he would have to waive his right to counsel" and that "I wanted to get his side of the story, but that was entirely up to him." Only five to ten minutes elapsed between the time petitioner asked for an attorney and the time he agreed to continue an interrogation. During that time, they continued to engage in some general conversation. The *Miranda* advice was not repeated prior to the commencement of the taped interrogation. In his taped statement, petitioner acknowledged that, in the course of an altercation regarding money that the victim owed him, petitioner grabbed a knife away from the victim and that the victim "ran into" the knife.

On this evidence, the Circuit Court denied the motion, finding, from a totality of the circumstances, that petitioner "knew what he was doing." The court stressed that there was only a five-to-ten minute gap between the request for counsel and petitioner's decision to submit to further interrogation.

## DISCUSSION

### Preservation

■ In a bare-bones omnibus motion, petitioner alleged that "[a]ny statements or confessions taken from Defendant were involuntary and were elicited during custodial interrogation without the observance of the procedural safeguards required by law" and sought the suppression of any such "illegally seized evidence and/or statements or confessions." No facts supporting that allegation and no points or authorities were included, either in the motion or in an accompanying memorandum, as required by Rule 4–252(e).[4]

---

4. In *Denicolis v. State,* 378 Md. 646, 660–61, 837 A.2d 944, 953–54 (2003), we called attention to the fact that Md. Rule 4–252(e) requires motions filed under that Rule, which includes motions to suppress

At the beginning of the hearing on that motion, defense counsel advised the court that petitioner "was interviewed by the police and he asked for a lawyer, and it is in not honoring that request that brings us to court this morning." Following the testimony, which focused, at least in part, on what had occurred after petitioner indicated a desire to consult with an attorney, the State's Attorney noted that the issues were whether petitioner had initiated the conversation and whether doing so constituted a waiver of his right to counsel. Although *Edwards* itself was not cited during the proceeding, *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), which was an *Edwards* case, was cited. It seems clear from the entire context that counsel and the court understood that to be the issue. The court ruled that petitioner had initiated the conversation that led to the inculpatory statements and knew what he was doing. We find that the issue was preserved for appellate review.

### *The Merits*

■ As we have indicated, the core holdings in *Edwards* were that once an accused, in a custodial interrogation, invokes his/her right to consult with an attorney, the suspect "is not subject to further interrogation by the authorities until counsel has been made available" unless the accused him-

---

unlawfully obtained statements, to state the grounds for the motion and contain or be accompanied by a statement of points and citation of authorities. We noted the practice that seemed to have developed of defense counsel filing omnibus motions "seeking a panoply of relief based on bald, conclusory allegations devoid of any articulated factual or legal underpinning, presumably in the belief that if the motion complies with the time requirement of Rule 4–252(b), compliance with Rule 4–252(e) is unnecessary." We made clear, however, that that was not the case, and that a motion that fails to provide either a factual or legal basis for granting the requested relief should not be granted. We pointed out in *Denicolis* and later in *Jones v. State,* 395 Md. 97, 103, n. 3, 909 A.2d 650, 655, n. 3 (2003) that we have been reluctant to disturb the discretion of trial courts to permit defendants to supplement the allegations of such a noncompliant motion at the time of a suppression hearing, at least where there is no objection from or prejudice to the State, and we shall not do so in this case, but that should not be taken as a license to ignore the requirements of the Rule.

self/herself "initiates further communication, exchanges, or conversations with the police" and that a valid waiver of that right "cannot be established by showing only that he responded to further police-initiated custodial interrogation." *Edwards, supra,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85, 68 L.Ed.2d at 386.

We are not concerned here with whether petitioner sufficiently invoked his right to an attorney. Detective McDermott accepted that he had, and the State does not contend otherwise. The question is whether the five or ten minute conversation that ensued after his invocation of that right constituted a prohibited interrogation. If so, it undisputedly was a custodial one.

Whether a conversation between a suspect and the police constitutes an interrogation for *Miranda/Edwards* purposes, though regarded as a mixed question of fact and law, is usually fact-dependent. Often, particularly in the *Edwards* context, what transpires is not a continued "grilling" or even a direct question-and-answer exchange, but something more subtle, requiring a reviewing court to look beyond merely parsing the conversation. As we noted in *Blake v. State,* 381 Md. 218, 233, 849 A.2d 410, 418 (2004), "[i]nterrogation means more than direct, explicit questioning and includes the functional equivalent of interrogation," which, the Supreme Court held in *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297, 307–08 (1980), includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

We added in *Blake,* quoting further, in part, from *Innis,* that (1) "[a]lthough the test of whether the police should know their words or actions are reasonably likely to elicit an incriminating response is an objective one, the intent of the police is not irrelevant," (2) "[i]f a police officer acts with a purpose of getting a suspect to talk, it follows that the officer has reason to know that his or her conduct was reasonably likely to elicit

an incriminating response." and (3) "[w]e focus on the defendant's perspective rather than on the police officer's intent." *Blake,* 381 Md. at 233–34, 849 A.2d at 419.

More recently, in *Ballard v. State,* 420 Md. 480, 24 A.3d 96 (2011), we observed that:

"The *Edwards* rule establishes a 'bright-line' prohibition against all subsequent questioning because, in the absence of such a prohibition, 'the authorities through "badgering" or "overreaching"—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.' "

*Id.* at 489, 24 A.3d at 101 (quoting in part from *Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 494, 83 L.Ed.2d 488, 495 (1984)).

It is with this backdrop that we look at the relevant decisions.

There are a score or more of cases in which, following an invocation of the right to an attorney, some further conversation occurred leading to the defendant either expressly agreeing to further interrogation or simply making inculpatory statements. In some, the appellate court determined that the statements or conduct of the police were not designed to prompt the result; in others, the court reached a different conclusion. On one end of the spectrum is post-invocation questioning that involves only routine booking matters—name, address, height, weight, eye color, date of birth, current age—which are permitted even without a *Miranda* advisement and do not constitute an impermissible interrogation. *Pennsylvania v. Muniz,* 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990). On the other end of the spectrum are cases like *Blake* and *People v. Bradshaw,* 156 P.3d 452 (Colo.2007).

In *Blake,* the 17–year–old suspect was arrested at his home between 4:30 and 5:00 a.m. in connection with a murder that had occurred about six weeks earlier. Wearing only underwear and no shoes, he was taken to a police station and

advised of his *Miranda* rights. He invoked his right to counsel and then was placed in a holding cell.

About a half hour later, a detective came to the cell, handed Blake a copy of the arrest warrant and a Statement of Charges, explained the charges, noted that they were serious, and told Blake that he needed to read them carefully. The Statement of Charges advised that Blake was charged with first degree murder and that the penalty for that crime was death. In fact, because Blake was under 18, he was *not* subject to the death penalty. As the detective was leaving, another detective appeared and said to Blake, "I bet you want to talk now, huh!" Although the first detective immediately stated that they could not talk with Blake because he had requested counsel, when that detective returned a half hour later with some clothes, Blake agreed to talk with him and, after a re-advisement and waiver of his *Miranda* rights, made some incriminating statements.

The State argued that the second detective's remark was merely a "rhetorical question" and not an interrogation and that the incriminatory statement was admissible because Blake had initiated the contact and then waived his right to counsel by agreeing to undergo interrogation. We rejected that argument and concluded that the remark that triggered Blake's willingness to talk "could only be interpreted as designed to induce [Blake] to talk and was improper." *Blake,* 381 Md. at 235–36, 849 A.2d at 420.

In *People v. Bradshaw,* the suspect was arrested for a parole violation and taken to a police station, where he was questioned about a recent complaint of sexual assault and theft. When the officer informed him that the victim had said that Bradshaw had grabbed her, Bradshaw indicated that if she said that, he needed to speak with a lawyer. Ignoring that response, the officer asked whether the contact was consensual, to which Bradshaw replied in the affirmative. At that point, the officer asked whether Bradshaw wanted to speak with a lawyer and Bradshaw said yes. The detective responded that, if Bradshaw wanted a lawyer, he would stop

the questioning and that any further questioning would have to be voluntary. At that point, Bradshaw agreed to talk. On that record, the Colorado court held that the interrogation never ended and that the detective's failure to honor Bradshaw's request for an attorney constituted a violation of the right to counsel.

The cases in the middle are fact-specific. In *Tindle v. U.S.*, 778 A.2d 1077 (D.C.App.2001), where, after the defendant asked for an attorney, the officer explained that, if the defendant did not want to talk, questioning would cease but told the defendant to "take some time to think about whether you want to answer, think about that question." After giving the matter some thought, the defendant agreed to talk. The court held that the officer's remark, though brief, nevertheless constituted an effort to persuade the defendant to reconsider his initial decision and was impermissible. *See* also *In re G.E.*, 879 A.2d 672 (D.C.App.2005). *Compare U.S. v. Thierman*, 678 F.2d 1331 (9th Cir.1982) where statements by the police regarding the likely course of the investigation and the possible involvement of the suspect's girlfriend, made following a request for an attorney, were held not to constitute the functional equivalent of an interrogation.

The case closest on point is *State v. Gonzalez*, 302 Conn. 287, 25 A.3d 648 (2011). Gonzales was arrested for murder and taken to a police station. Before giving him the *Miranda* advice, the detective told Gonzalez that he would be booked and that the police were giving him the opportunity to tell his side of the story. Gonzalez then asked for a lawyer. The detective told him to sit there and that he would be booked. After about a minute, Gonzalez blurted out that he was not a murderer, and the detective reminded him that he had asked for an attorney and that he should be quiet. When Gonzalez again said that he was not a murderer, the detective again reminded him that he had asked for an attorney but added that it would have to be his choice to speak without an attorney and inquired whether he wished to do so. No *Miranda* warnings had yet been given. Gonzalez responded

in the affirmative and eventually made some incriminating statements.

As here, the issue was whether the conversation constituted the functional equivalent of an interrogation, which the State eventually conceded and the court, focusing on the detective's statement that the interview provided an opportunity for Gonzalez to tell his side of the story, agreed. That statement, the court noted, was not a routine booking question allowed under *Miranda* and was "dissimilar to statements or questions directed at suspects that this court has determined were permissible because they were not reasonably likely to elicit an incriminating response from a suspect." *Id.,* at 656. It was not, the court added, "an objectively neutral question unrelated to the crime" but was "directly related to the murder investigation for which the defendant had been arrested, charged, and was presently being held in custody." *Id.* at 656. The detective acknowledged that he made the statement to "open up" the defendant in the hope that it would "prompt" him to converse about the murder. *Id.* 657. On that record, the court concluded that the conversation was the functional equivalent of an interrogation which, without the benefit of the *Miranda* advice, was impermissible.

In *People v. Wood,* 135 P.3d 744 (Colo.2006), Wood was arrested for murder and taken to a police station. A detective three times told him that the purpose of the interview was just to have ·a conversation and hear Wood's side of the story. After hearing the *Miranda* advisements, Wood said, "I definitely need a lawyer, right?" The detective responded that the decision to have counsel was up to Wood and that, if Wood wanted a lawyer the interview would end, but again emphasized that he wanted to hear Wood's side of the story. The detective then left Wood alone in the interview room, with a tape recorder running. While alone in the room, Wood spontaneously acknowledged having killed a man. When the detective returned and reminded Wood that the interview would have to be voluntary, Wood again asked for a lawyer, the interview ended, and Wood was taken to a holding cell. Sometime later, he asked to speak again with the detective,

and, when the detective appeared, Wood attempted to make a deal by providing information on illegal drug activity. The detective refused to talk with him.

The appellate court affirmed the suppression of Wood's statements to the detective under general *Miranda* principles, noting that the detective "should have known that his words and actions were reasonably likely to elicit an incriminating response." *Id.* at 751–52. The court found no problem with the spontaneous statement made while alone in the interview room, however. *See* also *People v. Dracon,* 884 P.2d 712 (Colo.1994).

■ Unlike in *Gonzalez,* Detective McDermott did not expressly admit that his intent in telling petitioner that he "wanted to get his side of the story" was to prompt petitioner to revoke his request to speak to an attorney, but, as in *Wood,* an express admission of that kind is not necessary. Not only may the detective's intent be inferred, but, as we pointed out in *Blake, supra,* 381 Md. at 233–34, 849 A.2d at 419, the focus in any event is on the defendant's perspective rather than the detective's intent.

The message conveyed when the police, having first established a rapport with a suspect who has been arrested and may be facing imminent incarceration, tell the suspect that they want to hear his or her side of the story is that the police are trying to be fair and that dialogue may be helpful to the suspect. That, of course, is rarely the case in fact, but the objective, and sometimes the reality, is that the suspect will believe it to be so and will respond accordingly.

The record reveals that to have been the case here. Petitioner was not there as a neutral witness. He was a suspect in a murder. It is implicit from Detective McDermott's testimony that, during the first conversation, petitioner was asked about the case and did not want to talk about his involvement. McDermott then switched to more general things and was proceeding nicely until Detective Mitchell barged into the room and temporarily "shut down your dialogue that you had been engaged in for about 45 minutes with

the defendant." It was after petitioner invoked his right to an attorney that Detective McDermott told him that "I wanted to get his side of the story"—to send the soothing, but misleading message which apparently took root.

 We do not condemn the police for using legitimate tactics, including telling a suspect that they would like to hear his/her side of the story, in order to induce the suspect to respond to questions or make a statement, so long as the *Miranda* advisements have been given and the suspect has validly waived the right to remain silent and the right to consult with an attorney. When those rights have not been waived, however, and the suspect has elected to remain silent generally or to consult with an attorney before undergoing further interrogation, that kind of inducement, in the absence of convincing evidence to the contrary, generally will suffice to constitute the functional equivalent of an impermissible continuing interrogation, dooming to suppression, in the State's casein-chief, any ensuing inculpatory statement.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY AND REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY WORCESTER COUNTY.