59 A.3d 1047

**Kimberly Marcia MOODY**

v.

**STATE of Maryland.**

No. 2018, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Jan. 23, 2013.

Julia C. Schiller (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Carrie J. Williams (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: ZARNOCH, GRAEFF, and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

GRAEFF, J.

After a jury trial in the Circuit Court for Baltimore City, Kimberly Moody, appellant, was convicted of first degree assault and conspiracy to commit first degree assault stemming from a fight that took place outside of Coconuts Café ("Coconuts"), a nightclub.[1] Appellant was sentenced to twenty years, with all but ten years suspended, for the assault, and a concurrent twenty years, with all but ten suspended, for the conspiracy conviction.

On appeal, appellant presents seven questions, which we have reordered and revised as follows:

1. Did the circuit court err in denying appellant's motion to dismiss the charges for violation of the statutory 180–day deadline for trying criminal cases?

---

**1.** The jury found appellant not guilty of transporting a handgun in a vehicle, and it did not reach verdicts on two counts charging appellant as an accessory after the fact.

2. Did the circuit court err in denying appellant's motion to suppress statements she made, without the benefit of *Miranda* warnings, to Baltimore City homicide detectives on March 20, 2009?

3. Was the evidence sufficient to convict appellant of first-degree assault and conspiracy to commit first-degree assault?

4. Did the trial court err in admitting "other crimes" evidence?

5. Did the trial court err in deviating from pattern jury instructions on aiding and abetting?

6. Did the trial court err in granting the State's motion *in limine* to exclude extrinsic evidence of prior inconsistent statements by a prosecution witness?

7. Did the trial court err in *sua sponte* supplying the jury with copies of written instructions on aiding and abetting and accessory after the fact?

As explained below, we shall reverse the judgment of the circuit court, holding that the circuit court erred in denying the motion to suppress appellant's March 20, 2009, statements to police because the statements were obtained during custodial interrogation, but no *Miranda*[2] warnings were given. Because we hold that the circuit court properly denied appellant's motion to dismiss, and because the State presented sufficient evidence to convict appellant of both the assault and the conspiracy charges, we shall remand for retrial.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant's convictions stem from her role in the March 7, 2009, assault of three women in the parking lot of Coconuts Café after an altercation involving her friend, Ms. Sharone Newton. The State's theory was that, after the altercation inside the club, Ms. Newton left the club, but appellant

---

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

subsequently drove her back to the club at closing time. It presented evidence that, at approximately 2:00 a.m., Ms. Newton attacked Ms. Sheray Belt and Ms. Brendi Simms with a metal pipe. Ms. Newton then retrieved a gun from her vehicle and fired shots. Ms. Belt was shot in the head, Ms. Simms was shot in the chest, and Ms. Sctario Edwards, a bystander, was shot and killed. During these crimes, appellant watched and maneuvered the vehicle for their getaway. When Ms. Newton ran out of bullets, she returned to the vehicle, and appellant drove away.

After interviewing witnesses at the club and reviewing surveillance video of the area during the altercation, Baltimore City investigators identified Ms. Newton as the suspected shooter. They obtained an arrest warrant for Ms. Newton and a search and seizure warrant for her home in Randallstown.

On March 20, 2009, the police went to Ms. Newton's residence to execute both warrants. When Ms. Newton arrived with appellant at the residence, the police asked them to exit the vehicle and sit on the curb, where they were handcuffed. Appellant and Ms. Newton subsequently were transported in separate police vehicles to police headquarters in Baltimore City. Upon arrival, appellant was released from her handcuffs and placed into a locked holding room. Detectives Ryan Felker and Vernon Parker then took her to an interview room and, without giving her *Miranda* warnings, questioned her about the shootings.

On June 1, 2009, based on further investigation, appellant was arrested. As indicated, she ultimately was convicted of first degree assault and conspiracy to commit first degree assault.

## DISCUSSION

### I.

### Delay in Trial Date

Appellant contends that the circuit court erred in denying her motion to dismiss the charges against her. Spe-

cifically, she argues that the State violated Md.Code (2009 Supp.) § 6–103(a) of the Criminal Procedure Article and Md. Rule 4–271(a), which require the State to bring a defendant to trial within 180 days after the earlier of a defendant's first appearance in circuit court or the appearance of defense counsel.

The State does not disagree that the trial occurred beyond this date. It points out, however, that the administrative judge or that judge's designee may grant a change of trial date beyond the 180–day period "for good cause shown," which it contends was shown here. Moreover, the State asserts, dismissal of the charges is inappropriate where, as here, the defense consents to a trial date in violation of the 180–day deadline.

In *State v. Hicks*, 285 Md. 310, 318, 403 A.2d 356 (1979), the Court of Appeals held that, unless there is good cause for postponing the trial date beyond the 180–day period (the "*Hicks* deadline"), the court must dismiss the charges. The critical postponement is the one that extends the trial date beyond the *Hicks* deadline. *State v. Brown*, 355 Md. 89, 108–09, 733 A.2d 1044 (1999).

Here, appellant's attorney entered his appearance on June 30, 2009. Consequently, the 180–day *Hicks* deadline was December 28, 2009.

On October 14, 2009, the case was postponed to January 14, 2010, making that the critical postponement for purposes of *Hicks*. On that date, the prosecutor advised the court that the DNA evidence was not yet available, and she and defense counsel were requesting a postponement. The court asked defense counsel whether he wanted to be heard, and counsel responded: "Not at all." Speaking directly to appellant, the court then explained that if the case was postponed, defense counsel would let her know of the new date. When asked if that was acceptable, appellant replied: "It's acceptable."

Although we do not have the transcript of the remainder of the proceeding, the State supplemented the record with a video recording of the proceedings. The recording shows that

appellant's case was recalled at 3:16 p.m. to complete the postponement request. The administrative judge stated that the new trial date would "take us past *Hicks*," but he ruled that "DNA has such probative value, for conviction and acquittal," that it was "appropriate to go past *Hicks*." Accordingly, the court found good cause for both the postponement and to exceed the *Hicks* date. The court stated that it would charge the postponement to both the defense and the State. At no time did defense counsel object to the postponement.

In August 2010, prior to the commencement of trial, the trial court denied appellant's motion to dismiss, ruling that there was good cause for the October 14, 2009, postponement that delayed trial until after the *Hicks* deadline. Appellant maintains that, in so ruling, the trial court abused its discretion. She asserts that there were no facts to support a finding of good cause because the administrative judge did not consider the need for DNA in this case.

██ Appellate courts "shall not find an absence of good cause unless the defendant meets the burden of demonstrating either a clear abuse of discretion or a lack of good cause as a matter of law." *State v. Frazier*, 298 Md. 422, 454, 470 A.2d 1269 (1984). Appellant has not met her burden here.

As indicated, the record reflects that the court determined that the potential importance of DNA evidence, as it pertains to conviction or acquittal, warranted a postponement. When the court made this observation, defense counsel never objected or suggested that this DNA evidence was not important. There clearly was a finding of good cause for a postponement, and this finding was supported by the record.

Moreover, the court specifically asked both appellant and defense counsel to comment on the request for a postponement, and neither voiced any objection. They essentially consented to the October 14 postponement. In *Hicks*, 285 Md. at 310, 403 A.2d 356, the Court of Appeals stated:

> [One] circumstance where it is inappropriate to dismiss the criminal charges is where the defendant, either individually or by his attorney, seeks or expressly consents to a trial

date in violation of Rule [4–271(a)(1)]. It would, in our judgment, be entirely inappropriate for the defendant to gain advantage from a violation of the rule when he was a party to that violation.

*Id.* at 335, 403 A.2d 356. The circuit court properly denied appellant's motion to dismiss.

## II.

## Motion to Suppress Appellant's March 20, 2009, Statements

■ Appellant contends that the circuit court erred in denying her pre-trial motion to suppress the statements she made to Detectives Parker and Felker on March 20, 2009. Specifically, she asserts that she was subjected to custodial interrogation, but the police failed to give her *Miranda* warnings.

The State disagrees. It argues that appellant was not in *Miranda* custody when she gave the March 20th statement.

### A.

### Proceedings Below

At the suppression hearing, Detective Felker testified that, on March 20, 2009, he assisted the primary homicide detective assigned to the case, Detective McDermott, with the arrest of Ms. Newton outside her residence. At approximately 9:00 p.m., Detectives Felker and McDermott, along with two other Baltimore City homicide detectives, several uniformed Baltimore County Police officers, and members of the Warrant Apprehension Task Force, were on site when appellant and Ms. Newton arrived at the residence. All the officers were armed, and some were in marked police vehicles. The officers drew their weapons, approached the vehicle, and ordered the two women to exit the vehicle. When the two women complied, the police "sat them down" and handcuffed them. Detective Felker explained that this was standard procedure "until we realize who is who and we know who our suspect is

and who else is involved and everything is safe for the officer safety."

While Detective McDermott and other officers were executing the search warrant for Ms. Newton's residence, Detective Felker, along with Detective Vernon Parker, transported appellant to police headquarters in Baltimore City. At 10:20 p.m., they placed her in a holding room and removed the handcuffs. Appellant was not told that she was free to go, and the door to the holding room was locked.

At 11:00 p.m., two hours after appellant was first detained, the two detectives moved appellant from the holding room "to interview room number six," which was "a small room, maybe ten feet by ten feet," with a table, three chairs, and a two-way mirror. The detectives told appellant that they had a warrant for Ms. Newton, who was under arrest, and they needed to speak to appellant regarding the incident at Coconuts. Appellant was not told that she was free to leave. Detective Felker asked for information and recorded appellant's answers on a Baltimore Police Department Information Sheet.

A copy of that document was admitted as evidence on the motion. According to Detective Felker's handwritten notes, appellant initially stated that the last time she was at Coconuts was the weekend after Valentine's Day, that she did not know if Ms. Newton went to Coconuts on March 7, that she did not know anything that led her to believe that Ms. Newton was involved in the shootings that night, and that she had never seen Ms. Newton with a gun.

Appellant subsequently admitted that she was with Ms. Newton at Coconuts the night of the incident, driving Ms. Newton's black Ford Explorer. According to appellant, she could not find Ms. Newton in the crowded club that night. When she went outside, she found Ms. Newton down the street, angry about something and wanting to leave. Between 12:45 and 1:00 a.m., they left the club with another woman who had come with them. Appellant drove to her home on Washington Avenue, about a half hour away. When Ms.

Newton left in the truck, and when appellant talked to her again at around 5:00 a.m., Ms. Newton seemed calm.

Detective Felker testified that appellant was cooperative and unrestrained while in the room with them. He did not recall appellant asking to leave, to use the bathroom, or to have a drink. At the conclusion of the interview, at 12:08 a.m., appellant was released, and Detective McDermott "arranged for her to have transportation back to wherever she ... needed to go."

On cross-examination, defense counsel asked Detective Felker whether appellant was "free to go" and whether "you would have unlocked the handcuffs" and "allowed her to get out of the vehicle and walk down on her merry way." The detective responded that "[s]he was cooperative with us" and "never asked us to leave." The detective explained that, when they detain a suspect in a homicide case, it is normal procedure to "initially put everyone in handcuffs" to ensure officer safety. It was his standard practice to remove handcuffs on such a person only after he "got her back to the office and ... had her in the environment of our office and we could talk to her and understand and see what she had to tell us." Once the handcuffs were removed at the office, however, he did not tell appellant that she was free to go.

At the conclusion of the hearing, defense counsel argued that the questioning of appellant on March 20, 2009, constituted custodial interrogation. Counsel noted that appellant was detained, handcuffed, taken to the police station, locked in a holding cell, and then interviewed by two homicide detectives. Accordingly, counsel argued, because *Miranda* warnings were not given, her statements should be excluded.

The State argued that appellant was not in custody, asserting that appellant was detained, not as a suspect, but for the safety of the officers who were executing an arrest warrant for her companion, Ms. Newton, whom they had reason to believe was armed and violent. Thereafter, the prosecutor argued, it was routine practice that "when homicide suspects are taken into custody, those parties around there are taken in to be

interviewed for investigatory reasons." She was not arrested, and she left the interview unencumbered.

Defense counsel replied that, even "[i]f there was reasonable apprehension" that appellant presented a danger to officers during the arrest of Ms. Newton, that concern had dissipated before appellant was taken in handcuffs to the police station. Counsel maintained that "what occurred was a restraint on liberty" that amounted to "an illegal arrest because there was no probable cause by the officer to restrain [appellant] of her liberty at the time that she was either on the curb [or] when she left the curb and got into the car." Counsel noted that appellant not only was "taken in handcuffs to the police station and marched upstairs in handcuffs, but she was locked in a room." He argued that, even if appellant was calm and cooperative, there was an unreasonable restraint at the time her statements were made without *Miranda* warnings, so the statements must be excluded.

The court denied appellant's motion to suppress the following day, ruling that appellant was not in custody when she first talked with the detectives. The court explained that it asked itself various questions in reaching its decision:

Was the defendant a suspect ... in the context of *Miranda* ...? The answer is no.

Was there evidence of any implicit or informal coercion or compulsion? The answer is no. Do the ... handcuffs themselves constitute such coercion or signify a quasi or actual formal arrest? The answer is no. Does any restrain[t] on free movement constitute an arrest? The answer is no.

Was the defendant a suspect? I already answered that one. No. Does questioning in the homicide headquarters constitute custody or formal arrest? The answer is no. Was the questioning directed at the defendant as a suspect again involved in the crime? The answer is no.

Did the defendant self-incriminate at all? No. Except to the extent that alleged inconsistencies might give cause to challenge her credibility should she testify? And I note

here also that the defendant was entitled to testify in this motion hearing and did not. Did the questioning as reflected in Detective Felker's notes amount to more than typical investigative fact finding by that detective? The answer is no.

Because of all those conclusions I've reached the motion is denied.

## B.

### Standard of Review

When reviewing the denial of a motion to suppress statements made without the benefit of *Miranda* warnings, we review the record of the suppression hearing in the light most favorable to the State as the prevailing party. *State v. Tolbert,* 381 Md. 539, 548, 850 A.2d 1192, *cert. denied,* 543 U.S. 852, 125 S.Ct. 263, 160 L.Ed.2d 85 (2004). We accept the suppression court's first-level factual findings, unless they are clearly erroneous, but then we conduct our own independent constitutional appraisal of the record to determine if, on the facts found, the defendant was "in custody." *Buck v. State,* 181 Md.App. 585, 609, 956 A.2d 884 (2008).

## C.

### Custodial Interrogation

As this Court recently explained in *State v. Thomas,* 202 Md.App. 545, 33 A.3d 494 (2011), *aff'd,* 429 Md. 246, 55 A.3d 680 (2012):

The Fifth Amendment to the United States Constitution, which applies to the States pursuant to the Fourteenth Amendment, *Maryland v. Shatzer* [559 U.S. 98], 130 S.Ct. 1213, 1219 [175 L.Ed.2d 1045] (2010), provides that "[n]o person ... shall be compelled in a criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona,* 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), the United States Supreme Court adopted a set of prophylactic measures to protect a suspect from the

"inherently compelling pressures" of custodial interrogation. *Shatzer,* 130 S.Ct. at 1219 (quoting *Miranda,* 384 U.S. at 467 [86 S.Ct. 1602] ).

Specifically, *Miranda* and its progeny require that the police, when they detain a person for questioning in a custodial setting, must inform the person of several rights:

> the right to remain silent, that anything the person says may be used in evidence, that the person has a right to consult with an attorney before responding to questioning, and that an attorney will be appointed if the person is indigent. . . . [A]n inculpatory statement elicited in violation of that requirement is inadmissible in the State's case-in-chief. *See Dickerson v. U.S.,* 530 U.S. 428, 120 S.Ct. 2326 [147 L.Ed.2d 405] (2000).

*Phillips v. State,* 425 Md. 210, 212, 40 A.3d 25 (2012).

It is clear, however, that the *Miranda* requirements apply only to custodial interrogation. *J.D.B. v. North Carolina,* —— U.S. ——, 131 S.Ct. 2394, 2401–02, 180 L.Ed.2d 310 (2011). As this Court has explained, "before a defendant can claim the benefit of *Miranda* warnings, the defendant must establish two things: (1) custody; and (2) interrogation." *Thomas,* 202 Md.App. at 565, 33 A.3d 494. *Accord Smith v. State,* 186 Md.App. 498, 518, 974 A.2d 991 (2009), *aff'd,* 414 Md. 357, 995 A.2d 685 (2010). The burden of "showing the applicability of the *Miranda* requirements," *i.e.,* that there was custody and interrogation, is on the defendant. *Id.* at 520, 974 A.2d 991.

Here, the State does not dispute that appellant was subjected to interrogation when she was questioned at the police station. The question presented in this appeal is whether appellant was in custody at the time of the interrogation.

Appellant argues that the motion court erred in concluding that she was not in custody for *Miranda* purposes when she made statements to Detective Felker on March 20, 2009. She asserts that a reasonable person in her position would not have felt free to leave, and her questioning "constituted the functional equivalent of an arrest." She contends that, be-

cause "[t]he Detective's questioning constituted custodial interrogation, which was conducted without [a]ppellant having been advised of, or having waived, her *Miranda* rights," the court erred in denying her motion to suppress the statements she made.

The State contends that appellant was not in custody. It argues that, "based on the totality of the circumstances, a reasonable person would not have believed that ... her freedom of movement was restricted to the degree associated with formal arrest." In support, the State argues:

[Appellant's] entire interaction with the police lasted a relatively short amount of time—three hours—and she was questioned as a potential witness, not a suspect. Detective Felker testified that, while [Appellant] was handcuffed for the ride to the homicide unit, he does that any time someone is being transported pursuant to a homicide investigation, and that the handcuffs were removed when [Appellant] arrived at the police station. After a relatively brief interview, [Appellant] left the station.

After conducting an independent constitutional appraisal of the suppression record, we agree with appellant that, based on the totality of circumstances, she was in custody for the purpose of *Miranda* at the time she was interviewed by Detectives Parker and Felker on March 20, 2009. The United States Supreme Court recently has stated that

"custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation" a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation."

*Howes v. Fields,* —— U.S. ——, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012) (citations omitted).

Although the inquiry begins with a determination whether a reasonable person would have thought he was free to leave the police encounter, that is merely the first step. *Id.* "Not all restraints on freedom of movement amount to custody for purposes of *Miranda.*" *Id.* Thus, if a person would not have thought he was free to leave, the next question is whether a reasonable person would understand that his freedom of action is restricted to a degree associated with a formal arrest. *See Shatzer,* 130 S.Ct. at 1224 ("To determine whether a suspect was in *Miranda* custody[,] we have asked whether 'there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' ") (quoting *New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)); *State v. Rucker,* 374 Md. 199, 211, 821 A.2d 439 (2003) ("Custody exists where there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."); *Smith,* 186 Md.App. at 533–35, 974 A.2d 991 ("That a detainee may not feel 'free to leave' . . . is not a talisman for determining *Miranda's* applicability," but rather, the test is " 'whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' ") (quoting *Rucker,* 374 Md. at 210, 821 A.2d 439).

In determining whether a suspect is in custody, the court must consider all of the circumstances of the interrogation, including:

"[W]hen and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning[,] whether he came completely on his own, in response to a police request or escorted by police officers. Finally, what happened after the interrogation whether the defendant left freely, was

detained or arrested may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning."

*Thomas v. State,* 429 Md. 246, 260–61, 55 A.3d 680 (2012) (quoting *Owens v. State,* 399 Md. 388, 429, 924 A.2d 1072 (2007)).

### 1. Circumstances Prior to Questioning

 As indicated, in assessing the totality of the circumstances to determine whether a suspect was in custody, " '[f]acts pertaining to events before the interrogation are ... relevant, especially how the defendant got to the place of questioning[,] whether he came completely on his own, in response to a police request or escorted by police officers.' " *Thomas,* 202 Md.App. at 568, 33 A.3d 494 (quoting *Owens,* 399 Md. at 429, 924 A.2d 1072). "When a defendant is escorted to the police station by the police, that is a factor weighing in favor of a finding of custody." *Id.* at 569, 33 A.3d 494.

Here, appellant was taken to the police station in a police vehicle after being confronted by multiple police officers, with weapons drawn. Although appellant was not told that she was under arrest, she was immediately handcuffed behind her back and seated on the curb for 30 to 45 minutes, while police began to execute the search and seizure warrant. Appellant was then transported in handcuffs to police headquarters in Baltimore. Upon arrival, appellant was released from the handcuffs, but only as she was placed into a small holding cell that was locked from the outside.

At no time during the two hours prior to questioning was appellant told that the police did not consider her a suspect in the crimes, that she was not under arrest, that she was free to leave, or that she was not obligated to talk to the detectives. These circumstances preceding the interview weigh in favor of a finding that appellant was in custody.

### 2. Circumstances During Questioning

With respect to the circumstances during the interrogation, the following facts are relevant to the custody analysis:

"[W]hen and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness."

*Thomas,* 202 Md.App. at 570, 33 A.3d 494 (quoting *Owens,* 399 Md. at 429, 924 A.2d 1072).

Here, starting with the location, the questioning took place in a police station. Although this Court has noted that "*Miranda* warnings are not required 'simply because the questioning takes place in the station house,'" we acknowledged that it "is more likely to be determined to be custodial interrogation." *Id.* at 571, 33 A.3d 494 (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)).

The length of the interview here was approximately one hour, beginning at 11:00 p.m., and ending at 12:08 a.m. During this time, appellant was questioned by two detectives, who elicited incriminating information that appellant was with Ms. Newton at Coconuts on the night in question and that she initially lied to them about that. Although this time period was not lengthy, it weighs in favor of a finding of custody. *United States v. Cavazos,* 668 F.3d 190, 194 n. 1 (5th Cir.2012) ("'A detention of approximately an hour raises considerable suspicion' that an individual has been subjected to custodial interrogation.") (quoting *United States v. Harrell,* 894 F.2d 120, 124 n. 1 (5th Circuit 1990)).

There is no evidence whether the interview room was locked or guarded, but Detective Felker made it clear that appellant would not have been permitted to leave the interview room without a police escort. Moreover, appellant would have required assistance to leave the police station because she did not drive herself to police headquarters.

With respect to "whether the defendant was being questioned as a suspect or as a witness," this factor is relevant

to the custody analysis, but only if it is communicated to the suspect because " 'custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.' " *Thomas,* 202 Md.App. at 573, 33 A.3d 494 (quoting *Stansbury v. California,* 511 U.S. 318, 323, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)). In this case, appellant knew before the interrogation began that Ms. Newton had been arrested and charged with crimes that occurred on March 7. She was not told, however, whether she was or was not under arrest. *Cf. Thomas,* 202 Md.App. at 572, 33 A.3d 494 ("appellee was told, on several occasions, that he was not under arrest," including "at the beginning of the questioning"); *McIntyre v. State,* 168 Md.App. 504, 519, 897 A.2d 296 (2006) ("Appellant was told that he did not have to answer any questions and that he was not under arrest."). Nor was she advised that she could leave or decline to talk with the detectives. *Cf. Ashe v. State,* 125 Md.App. 537, 551–52, 726 A.2d 786 (defendant voluntarily went to police station and was told he was not under arrest and was free to go at any time), *cert. denied,* 354 Md. 571, 731 A.2d 969 (1999). In such circumstances, a reasonable person might not be able to discern whether she was being questioned as a suspect or as a witness.

In sum, the circumstances during questioning, including that approximately one hour and eight minutes of questioning occurred at the police station, after appellant had been handcuffed and placed in a locked room, without being advised that she was not under arrest or that she was free to leave, weigh in favor of a finding that appellant was in custody.

### 3. Circumstances After Questioning

Another factor in the custody analysis is "whether the defendant was arrested after the interrogation." *Thomas,* 202 Md.App. at 577, 33 A.3d 494. This factor is relevant because "the act of leaving may, in hindsight, lend credence to a determination that the suspect was actually free to leave during the course of the questioning." *Id.* at 578, 33 A.3d 494

(citation and quotation omitted). *Accord Owens,* 399 Md. at 428–29, 924 A.2d 1072 ("what happened after the interrogation, whether the defendant left freely, was detained or arrested may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning."). *Accord Abeokuto v. State,* 391 Md. 289, 333–34, 893 A.2d 1018 (2006) (finding that the suspect was not in custody because, among other factors, he was not arrested during the questioning, and he was released after questioning).

Here, appellant was not arrested immediately after the interrogation. This fact weighs against a custody finding.

### 4. Totality of the Circumstances

Although appellant was released after questioning, a review of the totality of the circumstances leads us to conclude that appellant's statements were made while she was in custody. Appellant was removed from her vehicle at gunpoint, handcuffed, transported to the police station, and locked in a holding cell pending investigatory questioning. Although the record does not indicate that the manner in which appellant was interrogated over the next hour was coercive, the detectives never informed appellant that she was not a suspect, that she was not under arrest, or that she was free to leave or refuse to answer their questions. A reasonable person in such circumstances would believe that she was in custody.

Accordingly, the suppression court erred in denying appellant's motion to suppress the March 20, 2009, statements to Detectives Parker and Felker.[3] Appellant's convictions must be reversed.

---

3. The State does not argue, for good reason, that admission of those statements was harmless error. The State elicited testimony that, during this interview, appellant initially denied that Ms. Newton was her girlfriend, denied being at Coconuts on March 7, and denied any knowledge of who was involved in the altercation that night, but she later changed her story, admitting that she was at Coconuts with Ms. Newton, with whom she was "working on a relationship," and that she was driving Ms. Newton's vehicle on March 7. In closing argument, the

## III.

## Sufficiency of the Evidence

Appellant next asserts that the evidence was insufficient to support her convictions for first degree assault and conspiracy to commit first degree assault because there was no evidence: (1) of an agreement to commit the crimes; or (2) that she encouraged Ms. Newton to commit the crimes. Although we are reversing appellant's convictions due to the admission of the statements, we must address this contention. *See Ware v. State,* 360 Md. 650, 708–09, 759 A.2d 764 (2000) (When we reverse an appellant's conviction and appellant raises the sufficiency of the evidence on appeal, we must address that issue because retrial is not permitted if the evidence is insufficient to sustain appellant's conviction.), *cert. denied,* 531 U.S. 1115, 121 S.Ct. 864, 148 L.Ed.2d 776 (2001).

The principles governing our review of a sufficiency challenge are well-established:

We review "an issue regarding the sufficiency of the evidence in a criminal trial by determining 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Titus v. State,* 423 Md. 548, 557 [32 A.3d 44] (2011) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 [99 S.Ct. 2781, 61 L.Ed.2d 560] (1979)). The "fact-finder is free to believe part of a witness's testimony, disbelieve other parts of a witness's testimony, or to completely discount a witness's testimony." *Pryor v. State,* 195 Md.App. 311, 329 [6 A.3d 343] (2010). "We 'must give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference.'" *Cox v. State,* 421 Md. 630, 657 [28

State pointed to this evidence in arguing that appellant's trial testimony regarding the events of that evening was not credible because "she's given at least three ... different statements about what happened," beginning with the conflicting accounts she gave to Detectives Felker and Parker on March 20.

A.3d 687] (2011) (quoting *Bible v. State,* 411 Md. 138, 156 [982 A.2d 348] (2009)).

*Robinson v. State,* 209 Md.App. 174, 196, 58 A.3d 514 (2012).

## A.

### First Degree Assault

Appellant was convicted of first degree assault, which involves either: (1) intentionally causing or attempting to cause serious physical injury to another; or (2) committing an assault with a firearm. Md.Code (2008 Supp.) § 3–202(a) of the Criminal Law Article. The State's theory was that appellant aided and abetted the assault committed by Ms. Newton when Ms. Newton beat Ms. Belt with a metal pipe and then shot her with a firearm.

This Court has explained culpability as an aider and abetter as follows:

Whereas principals in the first degree "commit the deed as perpetrating actors, either by their own hand or by the hand of an innocent agent," principals in the second degree are "present, actually or constructively, aiding and abetting the commission of the crime, but not themselves committing it[.]" "An aider is one who assists, supports or supplements the efforts of another in the commission of a crime." "An abettor is one who instigates, advises or encourages the commission of a crime."

*Kohler v. State,* 203 Md.App. 110, 119, 36 A.3d 1013 (2012) (citations omitted).

Appellant contends that the evidence was not sufficient to convict her of aiding and abetting Ms. Newton's first degree assault on Ms. Belt because "[a]ppellant never got out of the truck[.]" In her view, the evidence established "only mere association with other perpetrators," so that she neither participated in nor encouraged the commission of the assault. *See Pope v. State,* 284 Md. 309, 331, 396 A.2d 1054 (1979) (evidence that defendant merely witnessed child abuse, without aiding or encouraging the perpetrator, was not sufficient to convict).

The record refutes appellant's claim that she was a mere witness to the assault on Ms. Belt. Aleta Grandy testified that, after Ms. Newton and Ms. Belt were involved in an altercation inside Coconuts that evening, club security asked Ms. Newton to leave. Ms. Grandy left the club with appellant and Ms. Newton, who dropped her at her home around 1:20 a.m. During the drive, Ms. Newton was very angry about the altercation. According to witnesses at the club and surveillance video showing the parking lot altercation, appellant and Ms. Newton returned to Coconuts at closing time, when Ms. Newton attacked Ms. Belt, Ms. Simms, and Ms. Simms's vehicle.

Ms. Simms testified that, while Ms. Newton was fighting, appellant turned the vehicle around and waited. As the fighting occurred in front of her, appellant watched, "emotionless." At one point when the fighting was right beside appellant, who was watching through the open driver's window, Ms. Simms looked at appellant and asked: "[W]hy did you bring them back?" Appellant did not answer or move the vehicle.

This evidence supports the jury's finding that appellant provided aid to Ms. Newton by driving her back to the club at closing time, repositioning the vehicle to provide an easy escape, waiting for Ms. Newton to complete the assault, and then providing for her escape. The evidence was sufficient to support the conviction for first degree assault.

## B.

### Conspiracy

Conspiracy is defined under Maryland criminal law as

the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. The essence of a criminal conspiracy is an unlawful agreement. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design. [Furthermore], the crime is

complete when the unlawful agreement is reached, and no overt act in furtherance of the agreement need be shown.

*Campbell v. State,* 325 Md. 488, 495–96, 601 A.2d 667 (1992) (citations and quotations omitted). *Accord Mitchell v. State,* 363 Md. 130, 145, 767 A.2d 844 (2001).

Appellant contends that the State failed to prove that she and Ms. Newton reached a "meeting of the minds" to commit a first-degree assault on Ms. Belt. The facts set forth, *supra,* refute this contention. A reasonable fact finder could infer that, after taking Ms. Grandy home, appellant and Ms. Newton agreed to return to Coconuts and assault Ms. Belt, with whom Ms. Newton had an altercation. The evidence was sufficient to convict appellant of conspiracy to commit first degree assault.

## IV.

### Other Contentions

Because appellant's remaining issues either were not preserved for appellate review or pertain to matters that may not recur on remand, we shall not address them.

**JUDGMENTS REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**